**Donald J. HAVILAND, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Petitioner Below).**

No. 53S00–9510–CR–1124.

Supreme Court of Indiana.

March 13, 1997.

William G. Smock, Terre Haute, for Appellant.

Pamela Carter, Attorney General of Indiana; Priscilla J. Fossum, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

A jury found appellant Donald J. Haviland guilty of murder, a felony, Ind.Code Ann. § 35–42–1–1 (West Supp.1996). The trial court sentenced him to sixty years in prison. In this direct appeal, Haviland raises the following issues:

1. Whether the trial court should have suppressed his confession, in particu-lar, whether Haviland's statement, "I'm through with this," constituted an invocation of his right to remain silent;

2. Whether the court erred by not order-ing an additional competency hearing during trial and by not finding Havi-land incompetent;

3. Whether there was sufficient evidence to support the conviction; and

4. Whether the sentence of sixty years was manifestly unreasonable.

We affirm.

## I. Facts

On June 13, 1992, Haviland went to his uncle's home after he and his roommate, Harold Williams, Sr., argued over some mon-ey. Haviland and his uncle watched a movie, drank some alcohol, and smoked "some weed and dope and crack." His uncle took a show-er and then he called for Haviland to come into the bedroom. Haviland entered the bedroom and saw his uncle lying on the bed, naked. Haviland's uncle wanted him to get in bed and have sex. Haviland was not interested. His uncle then told him that he could not stay if he did not have sex. While his uncle was lying in bed, Haviland took out his knife and stabbed him in the chest. His uncle got out of bed, fell on the floor, and died. Haviland then took his uncle's wallet and coin purse, removed the money, and discarded the wallet and purse.

Haviland returned to his apartment be-tween three and five in the morning on June 14, 1992, and gave all the money to Williams. At breakfast that morning, Haviland told Ha-rold Williams, Sr., and his two sons, Harold, Jr., and Mike, that he had killed his uncle. He asked Williams to dispose of his clothes and the knife. Haviland and Williams then left town for three or four days.

After the victim failed to show up at work for four days, the victim's superintendent went to his home on June 18th. Noticing a bad smell, he summoned the police. Officer Rich Hunter of the Bloomington Police De-partment arrived at the residence, entered, and found the victim face down on the floor of the bedroom. He noticed blood on the stereo near the body. Officer Hunter

searched for keys and a wallet. He found one set of keys to a vehicle, but no wallet.

The county coroner arrived. Among other things, he observed a small amount of blood on the bed and on pants lying across a chair. An autopsy placed the time of death at about June 13th. The pathologist later testified that there were two stab wounds to the chest, one reaching the victim's heart. He would later testify that the murder weapon could have been the knife entered into evidence.

A police evidence technician returned to the victim's home on June 19th. He found the door to the home open with a rug caught in it, though the door had been secured the previous night. The evidence tape placed across the doorway was torn. The bathroom window was open. A set of house keys were found in the pants on the chair; this aroused suspicion because these pants had been searched the previous evening and yielded no keys. The technician videotaped the home and took fingerprints.

Police later found a shirt, jeans, shoes and knife that had been discarded outside of town. Evidence at trial indicated these belonged to Haviland. There was no blood found on those items.

Police removed from the victim's house part of an interior door frame found to hold fingerprints. FBI fingerprint comparisons showed that the two prints on the door frame matched Haviland's left index finger, though not identically. A State Police DNA technician testified that the knife and the piece of the door frame tested positive for blood.

Bloomington police unsuccessfully attempted to contact Haviland at his residence. The police then learned that Haviland had an appointment with his probation officer on Thursday, June 23, 1992. Detective Helms met Haviland on this visit and said he needed to speak with him. The two proceeded to an interview room. Detective Helms spoke with Haviland for ten to fifteen minutes, during which time he gave *Miranda* warnings and Haviland signed a notification of rights form.

The portions of the interrogation relevant to this appeal proceeded as follows:

Q: Tell us what happened. We know what happened, we just need to hear it from you, we need to clear it up. You were there, did Danny make advances toward you? Is that what happened?

A. No.

Q: Was he pushing you? Trying to have sex with you? Is that what happened?

A: He never did.

Q: Something happened, what happened? Did you guys get into an argument over money?

A: We never have not into an argument.

Q: What happened, what happened to Danny?

A: I don't know what happened to him.

Q: Yes you do, you were there, what happened, tell what happened?

A: No I wasn't, what happened to him?

Q: He was killed. You know he was killed.

A: How?

Q: You tell me. You tell me what happened, you were there.

A: I don't know what happened.

Q: You were there.

A: I'm through with this.

Q: Listen to me, listen. . . .

A: I'm tired of listening to this. I'm through with it.

Q: List, just listen to me. We've got Harold over there. Harold's going to tell us about the stuff. He's going to tell us about the knife. He's going to tell us about the clothes, he's going to tell us about everything, you know? I'd rather hear it from you.

A: I'm through with this.

Q: You want to get this off your chest or not?

A: I'm through with this.

Q: [What do you mean, you're through with this].[1] It's going to eat at you forever until you tell somebody.

---

1. The transcribed record states that the detective said, "Let me get through this." After viewing the video tape, we are satisfied that the transcript

A: I said I'm through with it. I didn't kill nobody, you keep insisting I did and I didn't.

Q: I'm trying to find out what happened. I'm here to listen.

A: I wouldn't kill or hurt no one.

Q: Well I realize that you wouldn't normally kill or hurt anybody, but I think something happened. I think all this is building up in you. I think, well, we've talked to other people that you don't like homosexuals. I think something happened. Did something happen between you and Danny that made you blow up? You just lost control, you couldn't take it anymore?

A: No.

Q: Is that what it is?

A: I loved Danny, I mean I'd never do nothing to hurt him.

Q: I'm here to listen to you.

A: I'd never do nothing to hurt him.

Q: Something happened, something happened between you two. You were there, something happened, was Danny pushing himself on you?

A: No I wasn't, he never did.

Q: Was he trying to get your clothes off of you?

A: I'm through with this.

Q: What happened? Something happened between you two.

A: I said I'm through. I don't want to hear it no more.

Q: Well you have to hear it, we have to get to the bottom of it. This is not something you just....

A: I done told you everything I know.

Q: This is not something you turn off and on, you've not been in Martinsville the past two weeks, you've been in Martinsville the past few days.

(R. at 1022–26.) The videotaped interrogation lasted approximately an hour and thirty-nine minutes.

Haviland first declared, "I'm through with this," about five minutes into the videotaped statement, denying involvement in the murder. Detective Helms then asked Harold Williams, Sr., to enter the interrogation room. Williams had already informed the police about Haviland's declaration he had murdered his uncle and about his request for help in disposing of the clothes and knife. After encouragement from Detective Helms "to tell the truth," Haviland made a statement implicating himself in the homicide. Haviland did not ask to consult with an attorney at any time during the interrogation.

## II. Motion to Suppress

At trial, Haviland objected to admission of his videotaped statement. Haviland argued for suppression on either of two grounds: (1) the police failed to cease their questioning when he invoked his right to remain silent ("I'm through with this,"); or (2) he did not voluntarily and intelligently waive the right.

■■■ The burden of proof is on the State to prove that a defendant knowingly, intelligently, and voluntarily waived his rights under *Miranda. Buie v. State,* 633 N.E.2d 250 (Ind.1994). The State can prove this waiver by the actions and words of the defendant. *Light v. State,* 547 N.E.2d 1073 (Ind.1989). In reviewing a motion to suppress we do not reweigh the evidence. *Buie,* 633 N.E.2d at 256. We look at the totality of the circumstances and "consider all uncontroverted evidence together with conflicting evidence that supports the trial court's decision." *Id.*

### A. *Invocation of Fifth Amendment Right*

■■■ Haviland claims that the confession was taken in violation of his privilege against self-incrimination, citing the Fifth Amendment to the U.S. Constitution and Article I, section 14 of the Indiana Constitution.[2] He says his statement, "I'm through with this," unequivocally invoked his right to remain silent. The State contends Haviland was merely saying he did not want to hear that

___

was incorrect and that the detective said, "What do you mean, you're through with this."

**2.** We deal only with Haviland's Fifth Amendment claim. Appellant recites that he is also proceeding under Article I, section 14 of the Indiana

Constitution, but he makes no argument resting on that section. Consequently, this issue is deemed waived. *St. John v. State,* 523 N.E.2d 1353 (Ind.1988).

he killed anyone. The prosecutor compared Haviland to someone putting hands over his ears and yelling, "I can't hear you, I can't hear you." He believed Haviland was merely "avoid[ing] Detective Helms' . . . questioning. . . ." (R. at 930–31.) The prosecutor also argued, "He knows how to say the words, I'm not going to answer [any more] questions." (*Id.*) The advisement of rights form Haviland signed said, "If you decide to answer questions now without a lawyer present you will still have the right to stop answering at anytime." (R. at 900.)

Judge Kellams denied the motion to suppress. He noted that Haviland made no effort "to consistently avoid the questions of the interrogating officer" and "did continue reluctantly and very slowly to give information." (R. at 933). He found that Haviland's intention was "unclear." *Id.*

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law. . . ." U.S. CONST. Amend. V. The contours of a defendant's right to remain silent were delineated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

In *Mosley*, as here, the resolution of the case turned on the interpretation of a single passage in *Miranda:*

> Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cutoff questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in pro-

ducing a statement after the privilege has been once invoked.

*Mosley*, 423 U.S. at 100–101, 96 S.Ct. at 325 (quoting *Miranda*, 384 U.S. at 473–474, 86 S.Ct. at 1627–1628) (emphasis added). The issue presented is whether Haviland's declaration, "I'm through with this," meant, "I don't want to answer any more questions," an inquiry which is intensely fact-sensitive. Accordingly, this Court will not reverse unless the trial court's findings are not supported by substantial evidence and will look only to evidence favorable to the ruling. *Sears v. State*, 668 N.E.2d 662 (Ind.1996); *Schwartzkopf v. State*, 539 N.E.2d 953 (Ind. 1989).

■ Without reweighing the evidence, the transcript and videotaped interrogation reveal evidence sufficiently for us to conclude that the trial court did not err in finding that Haviland did not invoke his right to remain silent. As the State argues, Haviland's conduct was childish, akin to children "putting their hands over their ears and yelling loudly and saying, I can't hear you, I can't hear you." Although Haviland did not yell, his demeanor and the surrounding circumstances suggest the proverbial child in denial. He appeared only to be "through with hearing" that he had killed his uncle, not "through with answering questions."

■ Of course, a suspect in custody need not declare any particular words of legal magic to cut off questioning. When the interrogator became unsure of Haviland's intent, he asked, "What do you mean, you're through with this?"[3] Haviland responded, "I said I'm through with it. I didn't kill nobody, you keep insisting I did and I didn't." Then, Haviland just kept on talking. Judge Kellams noted this, finding "he made no effort to remain silent and not respond at all." (R. at 935.) Reluctantly, Haviland answered questions without pausing or indicating in any manner that he would no longer respond. He answered the detective's question by saying he did not do the crime, then continued talking.

---

**3.** As we said in *Jackson v. State*, 597 N.E.2d 950, 958 (Ind.1992), "If a suspect's request . . . is perceived to be inherently ambiguous, or equivocal in light of the preceding events, any further questioning should be narrowly limited to clarifying whether the suspect actually wished to [remain silent]."

We agree with Judge Kellams that Haviland did not exercise his Fifth Amendment right to remain silent.

### B. *Voluntariness of Confession*

Haviland claims his confession was involuntary. He contends the court failed to consider the coercive nature of the interrogation and his low level of intelligence.

 The trial judge must find that a confession was freely and voluntarily given before allowing the jury to hear it. *Light,* 547 N.E.2d at 1077; In *Buie v. State,* we reviewed the law governing admission of a defendant's confession:

> In determining whether a statement was voluntarily given, we look to all the circumstances surrounding its giving to determine whether it was "induced by any violence, threats, promises, or other improper influences." The same test determines whether a waiver of the *Miranda* rights has occurred.

*Buie,* 633 N.E.2d at 256 (quoting *Ortiz v. State,* 265 Ind. 549, 553, 356 N.E.2d 1188, 1191 (1976)). Ultimately, we examine the effect of the interrogation on the defendant's "will to resist." *Light,* 547 N.E.2d at 1077.

 The record does not support Haviland's claim of coercion. Detective Helms apprised Haviland of his *Miranda* rights, and Haviland signed a form which recognized his understanding of those rights. Haviland did not ask for a lawyer, nor did he refuse to answer questions. Defense counsel argues, however, "It is unrefuted that Detective Helms told the Defendant that the Defendant could not stop the interrogation." (Brief of Appellant at 23.) The portion of the interrogation to which he refers is the following:

Q: What happened? Something happened between you two.

A: I said I'm through. I don't want to hear it no more.

Q: Well you have to hear it, we have to get to the bottom if it. This is not something you just. . . .

A: I done told you everything I know.

Q: *This is not something you turn off and on,* you've not been to Martins-ville the past two weeks, you've been in Martinsville the past few days.

A: Yes I have.

Q: No, no, Shelly said she guessed you did leave, we've talked to Shelly and we're talking to Harold Jr., we're talking to Harold Sr., we're talking to Mikey. You don't, you don't want something to come out that's not true, do you?

(R. at 1025–26 (emphasis added).) There is no indication of violence, threats, promises or other improper influences. The videotape reveals that Detective Helms did not intimidate Haviland into confessing. Rather, through repeated questioning and encouragement to "tell the truth," Detective Helms elicited a confession. Viewed in context, the text emphasized above, "This is not something you turn off and on," establishes that Detective Helms was referring to the truth, not the interrogation.

 As for Haviland's claim about his mental capacity, a lower level of intelligence is not an absolute bar to a free and voluntary confession, but merely a factor to be considered by the trial court when coming to its decision. *Johnson v. State,* 584 N.E.2d 1092 (Ind.1992), *cert. denied,* 506 U.S. 853, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992). The trial court considered: (1) Haviland's confession to faking mental illness; (2) testimony given at three competency hearings; (3) the withdrawal of the insanity defense; and (4) Haviland's own competent testimony at the suppression hearing. The evidence on these points amply supports the trial court's finding that Haviland's confession was voluntary.

### III. Competency of the Defendant

 The trial court conducted three competency hearings; the last occurred three months before trial. The court found the defendant competent. A week before trial, Haviland withdrew his insanity defense.

At the close of the State's case-in-chief, but before presenting its own case, the defense called Dr. Paul Shriver to testify about Haviland's competency to stand trial. Dr. Shriver testified that he had spoken with Haviland for approximately twenty-five minutes

and concluded that he was not competent. The trial court found that he remained competent.

 Haviland contends the court should have appointed examining doctors for a fourth competency hearing. His claim rests on Ind.Code § 35–36–3–1(a):

(a) If at any time before the final submission of any criminal case to the court or the jury trying the case, the court has reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, the court shall immediately fix a time for a hearing to determine whether the defendant has that ability.

(West Supp.1996). A court is required to hold a hearing to determine the defendant's competency to stand trial only when it is confronted with evidence creating a reasonable doubt about the defendant's competency. *Brewer v. State,* 646 N.E.2d 1382 (Ind. 1995). Whether reasonable grounds exist to order an evaluation of competency is a decision assigned to the sound discretion of the trial court, reviewable only for an abuse of discretion. *Brown v. State,* 516 N.E.2d 29 (Ind.1987).

The trial court had already held three competency hearings. On the eve of presenting its case, the defense offered a doctor who had spoken with the defendant for twenty-five minutes and whose opinion was already before the court from previous competency hearings. The cumulative presentation of this testimony did not oblige the court to start anew the process of assessing Haviland's competency.

## IV. Sufficiency of the Evidence

 In reviewing sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Tillman v. State,* 642 N.E.2d 221 (Ind.1994). We consider only the evidence supporting the verdict and all the reasonable inferences drawn therefrom. *Id.* If each element of the crime is supported by substantial evidence, we affirm. *Id.*

 The physical evidence placing Haviland at the scene of the murder, his confession to three friends, and his confession to the police are adequate to support the jury's verdict.

## V. Reasonableness of Sentence

 Appellant contends that his sixty-year sentence was manifestly unreasonable because the trial court gave unreasonably great weight to aggravating circumstances, while failing to consider adequately his mental condition as a mitigating circumstance.

The trial court cited as aggravating circumstances: (1) Haviland's prior criminal history; (2) the fact that he was on probation at the time of the offense; and (3) the circumstances surrounding this particular crime, including Haviland's having left his uncle's body in the apartment decomposing for several days. The court then turned to Haviland's mental condition and background as mitigating factors. After reviewing evidence on Haviland's mental history, the court was not willing to "formally make of record a mitigating circumstance surrounding that condition." (R. at 1394.) The court also declined to find the defendant's background a mitigating factor.

 It is the trial court's responsibility to determine the weight to be given aggravating or mitigating circumstances. *Widener v. State,* 659 N.E.2d 529 (Ind.1995). The "proper" weight as suggested by the evidence is sometimes no weight at all. *Matheney v. State,* 583 N.E.2d 1202 (Ind.1992), *cert. denied* 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992). The trial court, after thorough and adequate consideration, reasonably decided to give no weight to Haviland's mental condition and background. The record contains conflicting expert testimony about Haviland's mental condition; indeed, he once confessed to faking mental illness. The trial court was entitled to judge this. Looking at the aggravating and mitigating factors as weighed by the court, we cannot say the sentence was manifestly unreasonable in light of the nature of the offender and the offense.

The trial court is affirmed.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.