Russell YERDEN, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 49S00–9509–CR–1074.

Supreme Court of Indiana.

July 3, 1997.

Kenneth T. Roberts, Roberts & Bishop, Indianapolis, for appellant.

Jeffrey Modisett, Attorney General, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

Appellant Russell Yerden appeals his convictions of attempted robbery, a class B felony, Ind.Code Ann. § 35–42–5–1 (West 1986); attempted murder, a class A felony, Ind.Code Ann. § 35–41–5–1(a) (West 1986); robbery, a class A felony, Ind.Code Ann. § 35–42–5–1 (West 1986), and murder, a felony, Ind.Code Ann. § 35–42–1–1 (West Supp.1996). He presents the following issues:

I.  Whether the trial court erred in denying Yerden's motion to suppress an oral statement he made while in custody;

II.  Whether the jury instruction on attempted murder was fundamental error;

III.  Whether the court erred in consolidating the attempted murder and murder cases, and

IV.  Whether Yerden received ineffective assistance of counsel on interlocutory appeal.

**Facts**

Russell Yerden lived with his girlfriend Bernice Henson, her parents, and her brother Michael Henson. On the evening of February 20, 1991, Yerden, Bernice, and Michael drank a case of beer at their home. After the beer was finished, Yerden sold his watch to buy a pint of whiskey. Still short on cash, the group decided to rob somebody. Michael retrieved his father's sawed-off shotgun, and the trio left the house. Their plan was to act like hitchhikers and rob those who gave them a ride. On their way to a nearby shopping area to solicit a ride, Yerden and Michael fought over who should have possession of the gun. Michael left. Russell Yerden (with the shotgun in his possession) and Bernice continued on their way.

Jayson Bergstresser offered them a ride. When Bergstresser asked where they were going, Yerden directed him to an area near railroad tracks. Yerden brandished the shotgun and repeatedly struck Bergstresser on the face. He demanded to know how much money Bergstresser possessed, and Bergstresser said he only had fifty dollars. Still driving down the road, Bergstresser managed to grab the barrel of the gun and struggled with Yerden for possession. Ultimately, Yerden regained possession of the gun. Yerden opened the door, threw out the gun, and jumped out of the car. Bernice jumped out, too. Yerden retrieved the shotgun and fired at Bergstresser's car as he fled. Bernice sustained some injuries due to jumping from the car and wanted to return home. Yerden insisted that they find "another one."

David McMahon was the next person who offered them a ride. Once inside the car, Yerden pulled the gun on McMahon and demanded to know how much money he had. McMahon threw his money into Bernice's lap. Yerden ordered McMahon to drive to the area by the railroad tracks and park the car. Bernice stated that she was going home and left. As she was leaving, Bernice heard gunshots and saw Yerden dragging McMahon's body up a hill to the railroad tracks. Yerden came running after Bernice and said, "I killed him; I had to kill him. He was fighting me back." Yerden and Bernice returned home and went to sleep.

On the second day after the murder, rumors persisted in the neighborhood that the police were looking for Yerden and Bernice. Bernice told her mother what had happened, and they called the police. A short time later, the police apprehended Russell Yerden. Detective Moore testified that he met with Yerden in his office to question him and that Yerden was advised of his constitutional rights. Yerden stated that he had been home all evening watching television. After giving this statement, Yerden was taken to Central Receiving for processing. At Cen-

tral Receiving, the police arranged a meeting between Yerden in which Bernice would tell Yerden that she had told the police the truth. Upon hearing Bernice's statement, Yerden became angry and said, "You f.... bitch, don't tell'em nothin'. You don't tell them people nothin'."

### I. Motion to Suppress

Yerden argues that the trial court should have suppressed the statement he made to Bernice Henson while in custody. Yerden claims that he invoked his *Miranda* rights and that the arranged encounter between him and Bernice was the same as if a police officer had solicited a response. He claims the statement was involuntary. We disagree.

■ The record shows that Yerden was taken to police headquarters at 7:40 p.m. on February 23, 1991. Yerden was advised of his *Miranda* rights upon arrival. He neither invoked his right to remain silent nor requested assistance of counsel. After being asked if he understood his rights, Yerden said he did. He then gave Detective Moore a statement concerning his whereabouts on the night of February 21. Yerden's actions constitute a voluntary waiver of his right to remain silent.

■ Arranging an encounter between the suspect and another witness in anticipation of eliciting a response from the suspect is a valid investigatory technique. It is similar to confronting a suspect with the statements of another witness of accomplice. We have previously held that this a proper investigatory technique. *Williams v. State*, 525 N.E.2d 337 (Ind.1988). The differences between revealing to a suspect what someone else said and arranging an encounter where an accomplice actually tells the suspect that she told the police the truth are modest. As the State correctly observes in its brief, "The police merely followed a different path in revealing Bernice's confession to Defendant." Appellee's Brief at 8.

■ Yerden contends that the encounter with Bernice occurred after he invoked his *Miranda* rights and the interrogation ceased. Actually, the record merely shows that Yerden gave his exculpatory statement and that

interrogation was "discontinued." Record at 211. There is no indication Yerden actually invoked his right to remain silent. Accordingly, police were free to continue interrogation, including arrangements for the meeting with Bernice. The trial court properly denied the motion to suppress.

### II. Jury Instruction

Appellant next claims that the jury instruction for attempted murder was given in error. Specifically, Yerden claims that the instruction "affirmatively misled" the jury with respect to the requisite *mens rea* for attempted murder. The instruction read as follows:

### ATTEMPT MURDER

A Person attempts to commit a crime when he knowingly or intentionally engages in conduct that constitutes a substantial step toward the commission of the crime.

The crime of Murder is defined by statute as follows:

A person who knowingly or intentionally kills another human being commits Murder.

To convict the Defendant of Attempt Murder, in this case, the State must have proved each of the following elements:

1. The Defendant knowingly

2. Engaged in conduct that constituted a substantial step toward the commission of

3. Knowingly killing another human being.

The Defendant must have had the specific intent to commit Murder in order to be found guilty of Attempt Murder. Intent to kill may be inferred from the use of a deadly weapon in a manner reasonably calculated to cause death.

■ The enumerated elements of the crime in this instruction were erroneous. *Spradlin v. State*, 569 N.E.2d 948 (Ind.1991). On the other hand, Yerden made no objection to the preliminary or final jury instructions on attempted murder.

When the defendant objects to an erroneous instruction on the elements of attempted murder and the trial court fails to correct the instruction, the defendant is generally entitled to reversal. *Greer v. State,* 643 N.E.2d 324 (Ind.1994). Yerden seeks to avoid his default by asserting that the error was fundamental. To assess fundamental error claims of this sort, "we look at the instructions as a whole to determine if they sufficiently informed the jury of the specific intent requirement for attempt." *Id.* If some other instruction adequately inform the jury that they must find that defendant had the "intent to kill" then there is no fundamental error. *Beasley v. State,* 643 N.E.2d 346 (Ind.1994).

We find that the instruction, on the whole, adequately informed the jury that Yerden must have intended to kill Bergstresser. The last two sentences of the instruction state that Yerden "must have had specific intent to commit murder."

### III. Consolidation

The State charged Yerden separately for the crimes against Jayson Bergstresser and David McMahon, and the court scheduled two separate jury trials. Subsequently, the State moved to consolidate, pursuant to Indiana Code 35–34–1–10(b) (West Supp. 1996), on grounds that both causes were based on a series of connected acts or constituting parts of a single scheme or plan. The trial court granted the consolidation, and Yerden filed an interlocutory appeal. The Court of Appeals affirmed. *Yerden v. State,* No. 49A02–9404–CR–233, 643 N.E.2d 999 (Ind.Ct.App., Dec. 7, 1994).

Yerden contends that the trial court abused its discretion in joining the offenses. The issue of consolidation is not available to be relitigated. The Court of Appeals decision regarding consolidation is now the law of the case. *Avery v. State,* 531 N.E.2d 1168 (Ind.1988).

### IV. Ineffective Assistance of Counsel

Yerden next argues that he received ineffective assistance of counsel on his interlocutory appeal. Specifically, Yerden targets the brief submitted to the Court of Appeals on interlocutory appeal and faults his counsel for (1) failing to argue that the defendant would be denied his right to testify in his own behalf since he may have wanted to testify in one case and not the other; (2) failing to show how prejudice would result by the new rules of evidence, particularly Rule 404; (3) and after the Court of Appeal's decision, failing to seek transfer to this Court.

Yerden's claim of ineffective assistance of counsel is evaluated under the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail, Yerden must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's performance the result would have been different. *Id.* at 687–96, 104 S.Ct. at 2064–69; *Fugate v. State,* 608 N.E.2d 1370, 1372 (Ind.1993). There is a strong presumption that counsel performance was not deficient, and that presumption must be overcome with strong and convincing evidence. *Id.* at 1372.

Counsel has literally provided no argument, much less any cogent argument, explaining how the lawyer who took the interlocutory appeal performed below prevailing norms. A healthy majority of lawyers who lose before the Indiana Court of Appeals, for example, elect not to seek transfer. On the face of it, without any explanation, a lawyer who does not petition for transfer has simply performed according to the statistical norm. Yerden's ineffective assistance claim fails.

### V. Conclusion

We affirm the trial court.

DICKSON, SULLIVAN, BOEHM and SELBY, JJ., concur.