Chad L. TAYLOR, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 17S00–9603–CR–202.

Supreme Court of Indiana.

Dec. 3, 1997.

attorney did not object to statements made during interrogation on the basis of Taylor's right to remain silent (as opposed to his right to counsel which was asserted)?

III. Did a detective's comparison of the circumstances of the arrests of Taylor and an accomplice constitute impermissible comments on Taylor's assertion of the right not to incriminate himself?

IV. Did the trial court commit reversible error by allowing opinion testimony in violation of Indiana Evidence Rule 704(b) as to the guilt or innocence of someone other than the defendant?

We affirm the conviction and remand for resentencing in accordance with *Smith v. State*, 675 N.E.2d 693 (Ind.1996).

## Factual and Procedural Background

At approximately 11:30 p.m. on November 25, 1994, John West, Howard Oberlin, Tina Rhodes, and Rhodes's three children went to bed in the manufactured home they shared in rural DeKalb County. John West and Tina Rhodes slept in the front bedroom with the youngest child in a crib beside them. The two other children and their grandfather, Howard Oberlin, slept in their beds in the back bedroom.

Several hours later, West was awakened by a booming sound and an impact that knocked him off the bed and onto the floor. He heard at least three more booming sounds, two of which came from the back bedroom. Realizing that he had been shot in the arm and was bleeding badly, West drove to a gas station where the police were called. Upon arriving at the residence, police found Howard Oberlin, Tina Rhodes, and one of the children dead from shotgun wounds. The front door of the home had apparently been kicked in, and the door bore a shoe print that forensics tests later established did not match the shoes of any of the occupants. West, who had seen one of the gunmen in a poorly lit hallway, initially told police that the gunman was Larry Lee, a former boyfriend of Tina Rhodes with whom West had clashed over Lee's relationship with Rhodes. Lee

Susan K. Carpenter, Public Defender, Gregory L. Lewis, Deputy Public Defender, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Andrew L. Hedges, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Chad L. Taylor was convicted of murder. The trial court sentenced him to sixty years imprisonment. In this direct appeal, Taylor raises four issues for our review:

I. Did Taylor invoke his federal or state constitutional right to counsel during police interrogation such that his subsequent incriminating statements were inadmissible?

II. Did Taylor receive ineffective assistance of counsel because his trial

was investigated and eliminated as a suspect for reasons described in Part IV below.

Almost four months after the shootings, Shane Delagrange came to the police station with his parents and confessed to his involvement in the crime. Delagrange told police that he had agreed to help defendant Chad Taylor kill West because of West's alleged molestation of a female friend of Taylor's. Delagrange said that the two had arrived at the crime scene with shotguns that Taylor had provided. Delagrange and Taylor had planned to shoot West when he answered the door. When no one answered the door, Taylor kicked the door in, and the two men entered the home. Finding several people inside the residence, Delagrange and Taylor decided to kill everyone to eliminate all witnesses. Delagrange went to the front bedroom and shot Tina Rhodes and West. Taylor shot Oberlin and a child in the back bedroom.

After Delagrange's confession, police obtained a search warrant for Taylor's residence. The search produced two shotguns later identified by police forensics experts as those used in the shooting, several rounds of ammunition, and a pair of tennis shoes later found to match the shoe print on the door of the home. Taylor was not at home when the search warrant was executed, but returned home to learn from his mother that police were looking for him. He went to the De-Kalb County Jail where he signed a waiver of rights form and was questioned by Detective Miles Stacey. When asked if he was involved in the crime Taylor said: "I don't know what to say. I guess I really want a lawyer, but, I mean, I've never done this before so I don't know." Stacey continued to question Taylor who eventually made two statements described below. He was subsequently arrested and charged with the murder of Howard Oberlin.

Taylor filed a motion to suppress his statements made during the interrogation, claiming that the statements were involuntary because they occurred after he requested counsel. The trial court denied the motion, the case went to trial, and a jury found Taylor guilty of murder. This appeal followed.

## I. Admissibility of Statements to Police

Taylor contends that his rights under both the federal and state constitutions were violated when police continued to question him after he said: "I don't know what to say. I guess I really want a lawyer, but, I mean, I've never done this before so I don't know." Specifically, Taylor contends that two of his statements made during the interrogation were admitted over his objection and were prejudicial. First, after he was told that Delagrange had confessed, he was asked if Delagrange's story was believable, and he answered affirmatively. Second, Taylor stated that he was "involved" and that he had lent the shotguns to Delagrange. At trial he explained his admission that he was "involved" as being limited to having lent the shotguns to Delagrange for hunting. Both statements were made shortly before the interrogation terminated when Taylor unequivocally requested a lawyer.

At the outset of the interrogation, Taylor signed a written waiver of rights form and orally acknowledged that he had been advised of his rights and had agreed to waive them. Although Taylor is not always precise in describing the rights he asserts were violated in this case, it is clear his waiver applied to both the right to counsel and the right to be free from self-incrimination under both the state and federal constitutions. The issue, therefore, turns on whether, after the waiver, Taylor asserted a valid right under the federal or state constitution that requires suppression of his subsequent statements.

■ Review of the denial of a motion to suppress is similar to other sufficiency matters. The record must disclose substantial evidence of probative value that supports the trial court's decision. We do not reweigh the evidence and we consider conflicting evidence most favorably to the trial court's ruling. *See, e.g., Wilcoxen v. State,* 619 N.E.2d 574, 577 (Ind.1993); *Warner v. State,* 579 N.E.2d 1307, 1309 (Ind.1991).

### A. *Federal constitutional claim*

■ Taylor first argues that his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were violat-

ed when police continued to question him after he made the quoted statement. Assertion of this right is governed by the objective standard set by the U.S. Supreme Court in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* at 459, 114 S.Ct. at 2355 (internal quotation marks and citation omitted). The level of clarity required to meet the reasonableness standard is sufficient clarity such that a "reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* It is not enough that the defendant might be invoking his rights; the request must be unambiguous. In *Davis*, the defendant's statement "maybe I should talk to a lawyer" was held not to be a request for counsel. *Id.* at 462, 114 S.Ct. at 2357. Consequently, police officers had no duty to stop questioning Davis, and any statements he subsequently made were admissible. *Davis* established as a matter of Fifth Amendment law that police have no duty to cease questioning when an equivocal request for counsel is made. Nor are they required to ask clarifying questions to determine whether the suspect actually wants a lawyer.

■ In this case, Taylor's statement of "I guess I really want a lawyer, but, I mean, I've never done this before so I don't know"

is an expression of doubt, not a request. A reasonable police officer in the circumstances would not understand that Taylor was unambiguously asserting his right to have counsel present. In fact, Detective Stacey's response to Taylor's comment was: "Okay. Like I told you, I can't make. that decision. for you." This response communicated that Stacey did not take Taylor's statement to be an assertion of the right to counsel and makes clear that if Taylor wanted a lawyer, he would have to communicate that desire. The trial court properly applied the *Davis* standard in finding that Taylor's purported assertion of his Fifth Amendment rights was not an unambiguous request for a lawyer. The trial court's ruling was also consistent with pre-*Davis* decisions of this Court.[1]

**B.** *Indiana constitutional claim*

Taylor next claims that the same interrogation violated his rights under the Indiana Constitution. Taylor argues that the right to have counsel present during a custodial interrogation is broader under Article I, § 13 of the Indiana Constitution than under the Fifth and Sixth Amendments. Specifically, Taylor contends that the right to counsel secured by § 13, unlike the federal Sixth Amendment right to counsel, attaches at an earlier stage than indictment or information. Over forty years before *Miranda* was decided on Fifth Amendment self-incrimination grounds, this Court held that a suspect's right to counsel—not the right to be free from self-incrimination—attaches when a

1. Taylor relies on *Sleek v. State*, 499 N.E.2d 751 (Ind.1986) as authority for reversal. In *Sleek*, the suspect said "I feel like I ought to have an attorney around," and this Court found the suspect's statement to be unambiguous enough to constitute a valid assertion of the right to counsel. *Id.* at 754. Taylor claims that his "request" is indistinguishable from that in *Sleek*. *Sleek* was decided on Fifth Amendment grounds eight years before *Davis*, and the *Davis* standard is controlling as to federal law. Nonetheless, *Sleek* would not lead to a different result. The suspect's request in *Sleek* was more inarticulate than ambiguous. *Cf. Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 ("[A] suspect need not speak with the discrimination of an Oxford don ....") (quoting Justice Souter's concurring opinion) (internal quotation marks omitted). In contrast, Taylor's statement, which began and was punctuated with "I don't know," is fairly assessed as self questioning or an expression of indecision. Accord-

ingly, even if *Sleek* were still good Fifth Amendment law, the trial court did not err in refusing on federal *Miranda* grounds to suppress incriminating statements gathered from Taylor during the interrogation with Detective Stacey. The exchange between Taylor and Detective Stacey more closely resembles what happened in *Pasco v. State*, 563 N.E.2d 587 (Ind.1990), another pre-*Davis* case applying Fifth Amendment precedent. There, the suspect said: "I don't know what to do ... I don't know if I should stop or if should get a lawyer." *Id.* at 591 (ellipses in original). The police officer told Pasco: "Well, that's completely up to you...." *Id.* In reasoning that presaged *Davis*, decided four years later, this Court distinguished *Sleek* and held that Pasco did not make a "definite request" for the assistance of a lawyer during custodial interrogation. *Id.* at 592. In sum, Taylor's Fifth Amendment claim fails under *Davis* or this Court's pre-*Davis* cases construing the Fifth Amendment.

suspect is in custody and before any formal "proceedings" have been initiated. As a result, exclusion of statements obtained after a suspect requested counsel was required by the state right to counsel. *Batchelor v. State*, 189 Ind. 69, 125 N.E. 773 (1920); *Suter v. State*, 227 Ind. 648, 88 N.E.2d 386 (1949). This Court has not addressed the question whether the right to counsel under § 13 remains the proper source of the rule, announced in *Batchelor* and *Suter*, that statements made in police custody after a request for counsel must be excluded from evidence. That is the result required under the Fourteenth Amendment since 1966 when *Miranda* was decided not on the basis of incorporation of the Sixth Amendment right to counsel but as a necessary incident to the Fifth Amendment self-incrimination right. *See also Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (once suspect requests presence of an attorney, questioning must cease until counsel has been made available or the suspect voluntarily initiates communication with the police).

■ Assuming that the same result *Miranda* and its progeny now require is also demanded by the Indiana constitutional right to counsel, an unequivocal request for counsel is necessary to require suppression of subsequent statements made while in custody, just as it is required by *Davis* to invoke the *Miranda* right to counsel. *Suter* and *Batchelor* both involved suspects who unequivocally requested counsel while in police custody, and both emphasized the necessity of a request to invoke the right. We make explicit today what was implied in *Suter* and *Batchelor*: the suspect's request must be clear and unequivocal. We agree with the Supreme Court's observation in *Davis* that "a statement either is such an assertion of the right to counsel or it is not." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355 (internal quotation marks and citation omitted). Although an ambiguous statement about invoking the right to counsel may indicate the suspect is considering the idea, it does not reflect a decision to ask for the assistance of counsel. Notably, Taylor later crossed that threshold in the interrogation and unequivocally invoked the right. When he did so, the interrogation stopped. The Indiana Constitution does not require a lawyer to be present during custodial interrogation irrespective of the suspect's wishes. If the suspect requests counsel, that is the end of the matter until counsel is furnished. But it is up to the suspect to make that request after being advised of his right to do so.

■ Taylor also contends that § 13 of the Indiana Bill of Rights requires police to limit the interrogation to clarifying questions when an ambiguous request is made. For this proposition Taylor relies on *Sleek v. State,* 499 N.E.2d 751 (Ind.1986). However, as noted above in footnote 1, *Sleek* expressly stated that it was interpreting the Fifth Amendment and makes no mention of the Indiana Constitution. Even if we assume that *Sleek* would suggest that a request for counsel triggers the same limitation under § 13 as the Fifth Amendment imposes, the U.S. Supreme Court explicitly rejected the clarifying questions limitation in *Davis,* which held that clarifying questions in the face of an ambiguous statement were "good police practice" but were not constitutionally required in the absence of a request for counsel. *Davis,* 512 U.S. at 461, 114 S.Ct. at 2356. As elaborated above, Taylor's statement did not constitute such a request. Taylor offers no authority contrary to the *Davis* view construing the Indiana constitutional right to counsel, and we discern no good reason for a different rule. Nothing precludes police from attempting to clarify ambiguous statements about invoking the right to counsel, but § 13 does not require that effort. In sum, although requests by the suspect for counsel must be scrupulously honored, a police interrogation is not required to come to a halt merely because the suspect chooses to think out loud about whether to exercise a constitutional right. It is within constitutional bounds for the interrogating officer to place the burden of making an explicit request for counsel on the suspect. This is what Detective Stacey did by responding to Taylor's expressions of indecision by saying that he could not make the decision for Taylor.

## II. Ineffective Assistance of Counsel/Right to Remain Silent

■ Taylor next argues that he received ineffective assistance of counsel under the

Sixth Amendment because his attorney failed to object to the admission of statements gathered during the interrogation. Taylor contends that after his expression of indecision described in Part I, he also made the statements described below which he contends asserted his Fifth Amendment right to remain silent, and that the police therefore had a duty under *Miranda* to stop questioning him. Because there was no objection to the statements on this ground, Taylor asserts that he received ineffective assistance of counsel.

To establish ineffective assistance of counsel, the defendant "must first show that trial counsel's performance was deficient under prevailing professional norms. He also must show that the deficient performance was so prejudicial to his case that he was denied a fair trial." *Marshall v. State*, 621 N.E.2d 308, 321 (Ind.1993). There is a strong presumption that trial counsel's performance was not deficient, and the defendant must overcome that presumption with strong and convincing evidence. *See, e.g., Yerden v. State*, 682 N.E.2d 1283, 1286 (Ind.1997). Where a claim of ineffective assistance is based on a failure to object at trial, the defendant must show that a proper objection, if made, would have been sustained. *Jackson v. State*, 683 N.E.2d 560, 563 (Ind.1997).

Taylor has not met the burden of overcoming the presumption that his trial attorney's performance was effective. He claims to have asserted his right to remain silent during the following exchange with Detective Stacey:

> *Stacey:* If you wanna tell us your version, that's why we're here. We're taking the time to talk to you.
> *Taylor:* I would, but I don't wanna say anything to ... I don't know. I wouldn't word it right. I know I wouldn't and I don't wanna get myself into trouble that I didn't do or that I did do or whatever and I just, you know. Since I've never done it, I'm nervous. I don't know what to say. I know you guys want to hear my story.
> *Stacey:* Absolutely.
> *Taylor:* And I would love to tell you my story, but I don't wanna tell you the story

because I don't wanna like slip up and say the wrong thing that'll get me into trouble.

After this exchange, Taylor continued to talk with Detective Stacey without indicating that he wanted to stop.

This Court in *Haviland v. State*, 677 N.E.2d 509 (Ind.1997) recently described the analysis of a purported assertion of the right to remain silent as "intensely fact-sensitive." *Id.* at 514. In that case, the suspect, after validly waiving his right to remain silent, said "I'm through with this" several times during a custodial interrogation. In affirming the trial court, we reasoned that the suspect "answered questions without pausing or indicating in any manner that he would no longer respond." *Id.* Although there are no "particular words of legal magic to cut off questioning," *id.*, a suspect must do more than express reluctance to talk in order to invoke his Fifth Amendment right to remain silent. Taylor expressed a concern that he would use the wrong words while talking and would not adequately convey his story. Critically, however, as in *Haviland*, Taylor never indicated that he would not talk at all. Because Taylor's comments did not constitute an assertion of the right to remain silent, failure to object based on that theory to the admission of subsequent statements cannot constitute ineffective assistance.

### III. Reference to Invocation of Right to Remain Silent

Taylor next asserts that the trial court erred in allowing the jury to hear an alleged reference to Taylor's decision to assert his right to remain silent. During redirect, the prosecutor asked Detective Stacey whether "the manner in which Shane Delagrange was ultimately arrested [was] any different than the manner in which Chad Taylor was arrested." Stacey responded: "Yes, due to the fact that [Delagrange] came in and voluntarily gave a statement or a confession of his involvement in this murder." Taylor characterizes this question and answer as an improper reference to Taylor's exercise of his right to remain silent. He claims that the only logical inference from this testimony is that because he waited to

come into the police station until he heard that police were looking for him he must have had "something to hide."

It is plainly improper for a prosecutor to comment on a defendant's post-arrest silence. *See, e.g., Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, Stacey's reference to Taylor's independent decision of when to initiate contact with police cannot be construed as a reference to Taylor's assertion of his right to remain silent. Although the relevance of the exchange on redirect is questionable, there is no ascertainable prejudice to Taylor and the detective's statement is not fairly understood by the jury to imply or comment on the defendant's silence.

### IV. Opinion Testimony

Taylor contends that the trial court committed reversible error by allowing opinion testimony in violation of Indiana Evidence Rule 704(b). That rule states in part that "witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case...." During direct examination, the prosecutor asked Detective Stacey to explain why Larry Lee, the original suspect in the murders, had been eliminated as a suspect despite West's identification of Lee as one of the perpetrators. Stacey answered that there was no evidence that Lee was anywhere other than at home on the night of the murders. Stacey noted that in a four-month investigation of Lee, Lee's alibi, corroborated by family members, was never found to be questionable. Forensic evidence showed that Lee's shoes did not match the shoe print of the person who kicked in the door of the victims' residence. Delagrange was admittedly one of at least two shooters in the house, and Delagrange and Lee did not know each other. Finally Stacey observed that West, the only person to implicate Lee, was seriously wounded and saw the perpetrator in a poorly lit hallway. At trial, West explained his initial identification of Lee as the shooter as an assumption he made based on the altercations between the two over Tina Rhodes.

One theory advanced by the defense was that Lee committed the crime instead of Taylor. Defense counsel, on cross examination, asked Stacey whether it was "possible" that Lee had committed the crime, and Stacey conceded that anything was possible. In response, the prosecutor asked Stacey on redirect whether he thought it was "probable" that Lee committed the crime. Taylor objected based on the fact that Indiana Evidence Rule 704(b) does not allow opinions as to guilt or innocence in a criminal case. The trial court overruled the objection, stating that the prosecutor was seeking an opinion about someone other than the defendant and, therefore, Rule 704(b) did not apply.

Taylor correctly asserts that Rule 704(b) does not distinguish between opinions as to a defendant's intent, guilt, or innocence and the intent, guilt, or innocence of someone other than the defendant. In this respect the Indiana version of the rule differs from its federal counterpart, which is expressly limited to the defendant's intent. It is difficult to ascribe any purpose to the omission of the reference to the defendant in the Indiana Rule if it is not to prevent opinion testimony as to anyone's guilt, intent, or innocence. Nonetheless, the error is harmless. To be reversible, opinion testimony must prejudice the defendant. *Butler v. State*, 658 N.E.2d 72, 79 (Ind.1995). Stacey's opinion was plainly cumulative in light of his testimony as to the reasons that Lee was eliminated as a suspect, including: (1) Lee's alibi withstood investigative scrutiny; (2) Lee's shoes did not match the shoe print on the home door; and (3) Lee did not know Delagrange, an admitted participant. Consequently, there was no prejudice to Taylor.

### V. Sentencing

Finally, it is necessary to address a sentencing issue not raised by the parties. At the time of the murders in this case, there were two sentencing statutes for murder in effect. As explained in *Smith v. State*, 675 N.E.2d 693 (Ind.1996), the controlling statute for murders committed between July 1, 1994 and May 5, 1995 is Public Law 158–1994, which provides for a forty-year presumptive sentence subject to a maximum twenty-year enhancement for aggravating circumstances. *See* 1994 Ind. Acts, P.L. 158, § 5. Also in

effect during this period was a sentencing statute providing for a fifty-year presumptive sentence enhanced by a maximum of ten years for aggravating circumstances. 1994 Ind. Acts, P.L. 164, § 2. Thus, a sixty-year sentence is possible under either statute and the only difference between them is the length of the enhancement for aggravating circumstances. Here the trial court did not specify which statute it used in arriving at sixty years for Taylor. In relevant part, the sentencing order states that "the aggravating circumstances outweigh the mitigating circumstances and justify ... sixty (60) years incarceration...." Because it is unclear from the sentencing order whether the trial court used the proper sentencing statute, we remand for resentencing under the controlling version of the statute. *Alvarado v. State*, 686 N.E.2d 819, 823–24 (Ind.1997).

### Conclusion

Chad L. Taylor's conviction for murder is affirmed. This case is remanded for resentencing in accordance with *Smith v. State*, 675 N.E.2d 693 (Ind.1996).

SHEPARD, C.J., and DICKSON and SELBY, JJ., concur.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Justice, dissenting.

After the police began interrogating defendant, he told them, "I don't know what to say. I guess I really want a lawyer, but, I mean, I've never done this before so I don't know." (R. at 2024.) After discussion, the police questioning continued. Defendant responded to their request that he tell his story by saying, "I would, but I don't wanna say anything to ... I don't know. I wouldn't word it right. I know I wouldn't and I don't wanna get myself into trouble that I didn't do no that I did do or whatever and I just, you know. Since I've never done it, I'm nervous. I don't know what to say. I know you guys want to hear my story." (R. at 2025–26 (ellipsis in original).) One of the officers responded, "Absolutely." (R. at 2026.) Defendant continued, "And I would love to tell you my story, but I don't wanna tell you the story because I don't wanna like slip up and say the wrong thing that'll get me in trouble." *Id.* After more discussion, the police questioning continued. Defendant responded, "But if I told my side of the story and ... I don't know. Lawyers say you're not supposed to say nothing without him present. I don't know. Well, it's like the movies, you know. Never say nothing unless your lawyer's present." (R. at 2027 (ellipsis in original).) Again the police questioning resumed and defendant made the incriminating statements used at trial. (R. at 2027–32.)

While I agree with the majority that police questioning need not stop just because the defendant is "thinking out loud," here the defendant asked for counsel but questioning continued. Defendant then made three attempts to explain why he was asking for counsel but each time questioning nevertheless continued. Under the circumstances, I believe the defendant's four statements, taken together, constituted a sufficiently clear and unambiguous request to have an attorney present that all questioning should have ceased.