BRADFORD, Judge,
dissenting.
Because I conclude that Officer Louder-milk had sufficient reason to believe that Dixon might have been armed and dangerous during their encounter, I believe that the officer’s pat-down of Dixon was justified by concerns for officer safety. Consequently, I would not suppress the drugs that were subsequently found on Dixon’s person, and I respectfully dissent.
At approximately 1:00 a.m., Officer Loudermilk was on patrol in his marked police vehicle when he observed a Chevrolet Cavalier make a turn without signaling. Officer Loudermilk activated his lights and siren, and the Cavalier pulled over with Officer Loudermilk behind. When Officer Loudermilk exited his vehicle, he noticed that the driver of the Cavalier, who was Dixon, was also exiting his vehicle. Officer Loudermilk approached Dixon and said, “Hey, you need to get back in your car[,]” but Dixon continued walking away. Tr. p. 10. Officer Loudermilk said again, “Hey, you need to get back in your ear[,]” but Dixon again continued to walk away. Tr. p. 10. When Officer Loudermilk took his Taser out and, without pointing it at Dixon, said, “You need to get back in your car” a third time, Dixon finally stopped. Tr. p. 10. When Dixon asked, “What did I do? What did I do?”, Officer Loudermilk responded, “You just needed to use your turn signal. Just have a seat in your car and we’ll go from there.” Tr. p. 10. In Officer Loudermilk’s experience, when a person exits a vehicle during a traffic stop, it means that the person does not want to be associated with the car or is trying to avoid the encounter with police altogether.
Officer Loudermilk had Dixon sit in Dixon’s vehicle with the door open so that he could observe him. In Officer Louder-milk’s words, “I wanted to keep an eye on him in case there was weapons or drugs.” Tr. p. 15. When Dixon gave Officer Loud-ermilk his identification, Officer Louder-milk realized that he recognized Dixon’s name. A week or two previously, a girl who Officer Dixon knew from when she was an inmate at the county jail approached him and told him that she had information that he might want. The informant told Officer Loudermilk that “there was a guy that lived in the area by the name of Robert Dixon and he was a black male and she was at his house earlier in the week and he had a large amount of cocaine at his house and he was dealing.” Tr. p. 17. The informant offered this information to Officer Loudermilk freely and in return for nothing.
While Dixon was in the vehicle, his demeanor was extremely nervous: He was rocking in his seat, would not look at Officer Loudermilk and was digging in his pockets. Officer Loudermilk told Dixon at least twice to leave his hands on the steering wheel where he could see them, but Dixon would quickly remove them again. Dixon had not dealt with a person more nervous in almost nine years as a police officer. Officer Loudermilk testified that he did not know whether Dixon “was waiting for [me] to turn [my] back so [Dixon] can pull out a gun and shoot [me]” Tr. p. 19. Officer Loudermilk called for backup, and Officer Birchfield soon arrived.
After Officer Birchfield arrived, Officer Loudermilk decided to pat down Dixon for weapons. Officer Loudermilk asked Dixon to exit his vehicle and said, “I’m going to make sure there’s not no weapons on ya.” Tr. p. 21. Officer Loudermilk had Dixon place his hands on top of the vehicle and began his pat-down. Officer Loudermilk felt a baggie “with a rock in there” in Dixon’s right front pants pocket. Tr. p. *65 21. When Officer Loudermilk grabbed the baggie, Dixon’s hands came off of the car, and Officer Loudermilk decided to handcuff him, as he had not yet cheeked Dixon’s waistband or other pockets.
Officer Loudermilk took hold of Dixon’s left hand and brought it behind Dixon but, when he moved to take hold of Dixon’s right hand, Dixon elbowed him in the nose. Dixon attempted to run away but the officers successfully took him to the ground. Dixon continued to struggle, attempting to roll over onto his back and digging in his pockets. Eventually, Officer Loudermilk tased Dixon, who initially began resisting again but stopped once Officer Loudermilk tased him a second time. Officer Louder-milk handcuffed Dixon, searched him, and found three baggies containing suspected cocaine on his person, which evidence Dixon filed a motion to suppress.
We review a trial court’s denial of a motion to suppress in a manner similar to review of other sufficiency issues. Taylor v. State, 689 N.E.2d 699, 702 (Ind.1997). There must be substantial evidence of probative value in the record to support the ruling of the trial court. Id. We do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court’s ruling. Id. We review de novo the determination of reasonable suspicion for a warrantless search. Myers v. State, 839 N.E.2d 1154, 1160 (Ind.2005) (citing Ornelas v. United States, 517 U.S. 690, 694-700, 116 S.Ct. 1657, 1660-64, 134 L.Ed.2d 911, 917-21 (1996)).
Sanders v. State, 989 N.E.2d 332, 334 (Ind.2013).
The Fourth Amendment to the United States Constitution provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” “The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.” Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). “In Wolf [v. People of State of Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ] we recognized ‘(t)he security of one’s privacy against arbitrary intrusion by the police’ as being ‘at the core of the Fourth Amendment’ and ‘basic to a free society.’ ” Id.
“[I]t is well-settled Fourth Amendment jurisprudence that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion that criminal activity ‘may be afoot.’ ” Overstreet v. State, 724 N.E.2d 661, 663 (Ind.Ct.App.2000) (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), trans. denied. Moreover,
[ajfter making a Terry stop, if an officer has a reasonable fear of danger, he may perform a carefully limited patdown of the outer clothing of the suspect in an attempt to discover weapons which might be used to assault the officer. The Terry patdown should be confined to its protective purpose. If the facts known by the officer at the time of the stop are such that a man of reasonable caution would believe that the action taken was appropriate, the Fourth Amendment is satisfied.
Parker v. State, 697 N.E.2d 1265, 1267 (Ind.Ct.App.1998) (citations omitted), trans. denied.
Our evaluation of the proper balance that has to be struck in this type of case *66 leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Cf. Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 226, 13 L.Ed.2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 174-176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035 (1878). And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or ‘hunch,’ but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. Cf. Brinegar v. United States, supra.
Terry, 392 U.S. at 27, 88 S.Ct. 1868 (footnote omitted).
Considering only the evidence favorable to the trial court’s judgment, a man of reasonable caution would believe that Officer Loudermilk’s actions were appropriate, given the information at his disposal at the time of the pat-down. Although Dixon argues that Officer Loudermilk patted him down on nothing more than a “hunch” that he might be armed and dangerous, Dixon’s argument disregards the fact that he walked away from his vehicle after being stopped, repeatedly ignoring Officer Loud-ermilk’s commands that he return. In Officer Loudermilk’s experience, such behavior indicates a desire to distance oneself from something in the vehicle or to escape the encounter altogether. As the Indiana Supreme Court has put it, flight “is ‘the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such’ and warrants further investigation by police.” Hardister v. State, 849 N.E.2d 563, 570 (Ind.2006) (quoting Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Once back in his vehicle, Dixon’s demeanor was extremely nervous — indeed, Dixon was the most nervous person Officer Loud-ermilk had ever encountered on the job. Dixon repeatedly failed to comply with Officer Loudermilk’s requests that he keep his hands on the steering wheel, refused to look at Officer Loudermilk, was rocking in his seat, and was digging in his pockets. Dixon’s behavior was unsettling enough that Officer Loudermilk did not run his plates for fear of turning his back on Dixon.
Moreover, during the course of the stop, Officer Loudermilk became aware that Dixon was likely the person he had recently been told was a drug dealer who had large amounts of cocaine in his residence. Because this information was delivered face-to-face by a person known to Officer Loudermilk, it bears indicia of reliability. When an informant relates information to the police face-to-face, the officer has an opportunity to assess the informant’s credibility and demeanor. U.S. v. Christmas, 222 F.3d 141, 144 (4th Cir.2000). Additionally, a face-to-face tipster has surrendered her anonymity. “[CJitizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints.” Id. (citing Illinois v. Gates, 462 U.S. 213, 233-34, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Finally, the tip was freely given, and the informant was neither offered nor given anything in return.
Having information that he might be dealing with a drug dealer in Dixon, Officer Loudermilk was reasonably concerned about the possibility that Dixon might be *67 armed. Several courts have recognized that “drug dealers and weapons go hand in hand[.]” State v. Richardson, 156 Wis.2d 128, 456 N.W.2d 830, 836 (1990) (citing U.S. v. Pajari, 715 F.2d 1378 (8th Cir.1983); U.S. v. Post, 607 F.2d 847 (9th Cir.1979); and U.S. v. Oates, 560 F.2d 45 (2d Cir.1977)); see also, e.g., U.S. v. Salazar, 945 F.2d 47, 51 (2d Cir.1991) (noting that the officers in question were “sufficiently experienced to know that narcotics dealers frequently carry weapons”); U.S. v. Gilliard, 847 F.2d 21, 25 (1st Cir.1988) (concluding that frisk was justified where “officers ... suspected Gilliard of having participated in a narcotics sale and knew that firearms are ‘tools of the trade[ ]’ ”).
While any one factor standing alone might not support a pat-down for officer safety, the overall circumstances do. In short, the information known to Officer Loudermilk at the time of the pat-down would cause a man of reasonable caution to believe his actions were appropriate. Dixon’s attempt to distance himself from Officer Loudermilk and/or his vehicle; his repeated refusal to follow Officer Louder-milk’s instructions; his repeated attempts to seemingly access something in his pockets (which might have been a weapon); his extreme nervousness; and Officer Louder-milk’s information, bearing indicia of reliability, that Dixon might be a drug dealer, all combine to provide sufficient justification for a pat-down for weapons.
Dixon relies on our opinion in Jett v. State, 716 N.E.2d 69 (Ind.Ct.App.1999), in which we found a pat-down to be unconstitutional. Jett, however, is readily distinguished. In Jett, the defendant’s vehicle was stopped, and Jett exited his vehicle. Id. at 70. When the officer asked Jett to return, Jett immediately complied. Id. The officer then asked Jett to submit to a pat-down, which uncovered incriminating evidence, and which we found to be unconstitutional, resulting in the reversal of Jett’s conviction. Id. at 71. In this case, however, Officer Loudermilk had much more. As previously mentioned, Dixon repeatedly refused to comply with Officer Loudermilk’s requests to return to his vehicle and keep his hands on the wheel and behaved in a suspicious and nervous manner. In addition, Officer Loudermilk had credible information that Dixon might be a drug dealer. Because the two cases are factually distinguishable, Dixon’s reliance on Jett is unavailing. The trial court did not abuse its discretion in denying Dixon’s motion to suppress on the basis that Officer Loudermilk’s search violated the Fourth Amendment.[2]

. Although Dixon makes a separate argument pursuant to Article I, Section 11 of the Indiana Constitution, "Indiana has adopted the Terry rationale in determining the legality of an investigatory stop under Article I, Section 11.” Holbert v. State, 996 N.E.24 396, 400 (Ind.Ct.App.2013) (citing Wilson v. State, 670 N.E.2d 27, 29 (Ind.Ct.App.1996)), trans. denied. Consequently, we need not address this argument separately.