Jeffrey Dean WASHINGTON, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 65S00–0209–CR–477.

Supreme Court of Indiana.

May 20, 2004.

William W. Gooden, Mt. Vernon, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney. General, Indianapolis, IN, Attorneys for Appellee.

RUCKER, Justice.

## Case Summary

Based in part on his confession, Jeffrey Dean Washington was convicted of murder in the stabbing death of his ex-girlfriend. Alleging two statutory aggravating circumstances, the State sought life imprisonment without parole. The jury recommended life imprisonment and the trial court sentenced Washington accordingly. In this direct appeal Washington raises the following rephrased issues: (1) did the trial court err in denying Washington's motion to suppress his confession; (2) did the trial court err by not redacting portions of Washington's confession; (3) did the trial court err in refusing to instruct the jury on the lesser offense of voluntary manslaughter; (4) did the State prove the existence of a statutory aggravator beyond a reasonable doubt; (5) was Washington sentenced in violation of *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and (6) was the trial court's sentencing order sufficient. We affirm the trial court's judgment.

## Facts and Procedural History

The recent end of a romantic relationship with the victim Sandra Bass apparently upset Washington. At some point in the late evening hours of December 5, 2001, he walked to the apartment complex where Bass lived with her three children and saw Bass and another man leaving the apartment complex in Bass' car. Bass returned a short time later, parked her car in her assigned spot and was getting out of her car when Washington confronted her. Armed with a butcher knife and wearing a pair of socks over his hands, Washington shoved Bass back into the car and stabbed her at least thirteen times. Washington fled the complex and hid the knife and his clothes in separate locations. Bass bled to death from the stab wounds. The following day, Washington was apprehended and

questioned at length by the police. After an initial attempt to provide the police with an alibi for the previous night, Washington admitted stabbing Bass.

The State charged Washington with murder. Alleging that he committed the murder while lying in wait, Ind.Code § 35–50–2–9(b)(3), and while on probation, I.C. § 35–50–2–9(b)(9)(C), the State also sought life imprisonment without parole. After a trial by jury Washington was convicted as charged. At the penalty phase of trial, the jury recommended that a sentence of life imprisonment without parole be imposed. The trial court thereafter sentenced Washington consistent with the jury's recommendation. This direct appeal followed. Additional facts are set forth below where relevant.

## Discussion

### I.

#### *Motion to Suppress*

Prior to trial Washington filed a motion to suppress his confession, which the trial court denied. At trial, over Washington's objection, the State introduced into evidence a videotape of the police interrogation of Washington along with a transcript of the interrogation. Washington contends the trial court erred in failing to suppress his confession because: (i) in advance of questioning, the police failed to advise Washington concerning the nature of the interrogation thus rendering his confession involuntary; (ii) the police engaged in deception thus rendering his confession involuntary; and (iii) the police continued to question him after he invoked his right to remain silent. We address each contention in turn.

#### A. *Advisement in Advance of Waiver*

■ The record shows that after his arrest, Washington was escorted to the Posey County jail. While in the interrogation room, Officer Marvin Heilman presented Washington with a waiver of *Miranda* rights form and explained its contents in detail. Washington read the form aloud, acknowledged that he understood his rights, and signed the document. At that point the officer informed Washington: "[I] just wanna talk to you a little bit about the events of the last, last few weeks really but especially last night. . . . [S]ome events involving Sandra Bass a former girlfriend. . . ." Joint Ex. 1 at 4. Washington contends that his waiver of *Miranda* rights was rendered involuntary because the officer failed to advise him about the subject of the interview before questioning began.

In *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the United States Supreme Court explained that it had "never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights. . . ." *Id.* at 576, 107 S.Ct. 851. The Court went on to note: "Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right—'his right to refuse to answer any question which might incriminate him.'" *Id.* The Court observed that additional information given by the police would only go to the "wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 577, 107 S.Ct. 851. Ultimately the Court concluded that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.; see also Allen v. State,* 686 N.E.2d 760, 773 (Ind.1997) (applying the rule set forth in *Spring* and noting "[t]he constitutional issue does not

concern the tactical wisdom of the defendant's choice to speak, but only the defendant's voluntariness in choosing to speak"). In this case the police officer's failure to advise Washington in advance of the purpose of the interrogation did not render involuntary Washington's waiver of his *Miranda* rights. Washington cannot prevail on this issue.

### B. Police Deception

■ While in custody Washington was interrogated by at least two different officers, including Heilman and Gary Gilbert. During the interrogation Officer Heilman made the following statements:

> We'll prove to you her blood's all over your clothes and I'll prove to you that you were there when she died.
>
> You got your supposedly your best friend in the world's blood on your clothes.

Joint Ex. 1 at 111. Officer Gilbert added:

> [W]e've got physical evidence from her blood on your clothes.
>
> Her blood on your clothes Jeff.
>
> Those are your clothes, that's her blood on your clothes.

*Id.* at 112, 119, 133. In addition Officer Heilman asserted:

> Your sisters, your grandma and your mother, they've all been talking to us all night scared to death, what happened to Jeff. What's he going to do to himself. *You know they all think you did it.*

*Id.* at 134 (emphasis added). Washington complains that at the time of the interrogation neither Officer Heilman nor Officer Gilbert knew whether there was blood on Washington's clothing nor, obviously, whether any such blood belonged to Bass. Washington also complains that at the sup-

pression hearing, Officer Heilman admitted that the statement "you know they all think you did it" was generally not true. According to Washington the foregoing conduct by the officers was deceptive thus rendering his confession involuntary.

■ When a defendant challenges the admissibility of his confession, the State must prove beyond a reasonable doubt that the confession was given voluntarily. *Carter v. State,* 730 N.E.2d 155, 157 (Ind. 2000).[1] The voluntariness of a confession is determined from the "totality of the circumstances." *Berry v. State,* 703 N.E.2d 154, 157 (Ind.1998). In turn, the "totality of the circumstances" test focuses on the entire interrogation, not on any single act by police or condition of the suspect. *Light v. State,* 547 N.E.2d 1073, 1079 (Ind.1989). We review the record for evidence of inducement by way of violence, threats, promises, or other improper influences. *Berry,* 703 N.E.2d at 157.

■ It is technically true that at the time of the interrogation the officers did not know whether Washington's clothing was covered with Bass' blood. At best this was pure conjecture offered as fact. However, "not all police interrogation statements of conjecture, presented as fact, constitute police deception." *Miller v. State,* 770 N.E.2d 763, 767 n. 5 (Ind.2002). Rather, where the police have a "good faith basis for their technical falsehood, then their action will not be deemed deceptive." *Id.* at 768 n. 5. The record shows that at the time of the interrogation, the police had recovered clothing that appeared to be bloodstained and had spoken with a witness who had seen Washington changing out of those clothes the previous night. R. at 18–19, 34–36. The clothing

---

1. Indiana courts require the State to prove the voluntariness of a confession beyond a reasonable doubt, unlike federal decisions, which require only proof by a preponderance of the evidence. *See Henry v. State,* 738 N.E.2d 663, 664 n. 1 (Ind.2000).

had been submitted to the police crime laboratory, although the results had not yet been returned.[2] We conclude the officers had a good faith basis for asserting that Washington's clothing was stained with the victim's blood. Accordingly, the officers' statements were not deceptive.

Concerning Officer Heilman's statement that "you know they all think you did it" Washington does not explain how this statement rendered his confession involuntary. In like fashion we do not see "an apparent explanation as to why this comment would render defendant's statement involuntary." *Heavrin v. State*, 675 N.E.2d 1075, 1081 (Ind.1996) (rejecting a claim that an officer's reference to defendant's wife's infidelities rendered his subsequent statement involuntary).

### C. *Invocation of Right to Silence*

■ In support of his claim that the interrogating officers continued to question him after he invoked his right to remain silent, Washington directs our attention to that portion of the interrogation in which he at one point declared: "I'm tired of talking. I'm listening." Joint Ex. 1 at 109. He also directs our attention to another portion of the interrogation in which the following exchange occurred:

[Washington]: I'm not gonna say nothing man you're … you're just talking. What does it look like I'm not going to admit to something I didn't do. I'll let the jury decide that.

[Officer Gilbert]: Are you telling us that those are not your clothes?

[Washington]: I'm not saying a thing.

*Id.* at 114.

■ When a person "indicates in any manner, at any time prior to or during questioning, that he wishes to remain si-

lent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Haviland v. State*, 677 N.E.2d 509 (Ind. 1997) this court described as "intensely fact-sensitive" the analysis of a purported assertion of the right to remain silent. *Id.* at 514. In that case, after waiving his right to remain silent, the defendant said several times during the course of a custodial interrogation, "I'm through with this." *Id.* at 513. We acknowledged that a defendant "need not declare any particular words of legal magic to cut off questioning." *Id.* at 514. However, in affirming the trial court, we reasoned that the defendant "answered questions without pausing or indicating in any manner that he would no longer respond." *Id.* The same is true here.

After declaring that he was "tired of talking" and that he was not going to say anything, Washington continued to engage the interrogating officers in conversation. The record shows that several times Washington questioned the officers concerning the strength of evidence against him. Joint Ex. 1 at 116, 120–28. And at one point when Officer Heilman asked Washington whether he wanted the questioning to stop Washington responded, "I want to see the pictures there." Joint Ex. 1 at 122. Washington's comments do not demonstrate an assertion of his Fifth Amendment right to remain silent. Accordingly, Washington's claim on this issue fails. In sum, the trial court properly denied Washington's motion to suppress.

### II.

### *Redaction of Confession*

Washington next contends the trial court erred in failing to redact portions of

---

**2.** The record shows that the officers' conjectural statements proved to be true. At trial the State introduced forensic evidence that the shirt and socks Washington wore the night of the stabbing were stained with Bass' blood. R. at 476–77, 491–95; State's Exs. 35, 39, 40, 45.

his videotaped interrogation and the typed transcript of the interrogation. The facts are these. Prior to trial Washington moved to redact certain portions of the videotaped interrogation and the typed transcription. The entire transcribed statement consisted of 157 pages of singled-spaced type. To accomplish that end, Washington penciled in red those portions of the statement he sought to have stricken. Contending that "maybe higher than ninety-five (95) percent of the verbiage in this statement are statements made by the detectives," R. at 52, Washington moved to redact all, or nearly all, of approximately twenty pages of the statement. Although acknowledging case authority that would allow the unredacted statement into evidence provided a proper admonishment is given, Washington continued:

> My argument is going to be this, this statement is full of the detectives stating their opinion as to the ... In some cases it was wrong, in some cases it was out and out ... you know, absolutely wrong, as we established at the hearing we had on the motion to suppress, and the detectives acknowledged some of what they said was wrong. So, some of it's opinion, a lot of it's claiming what ... a lot of it's hearsay what other people had said.

*Id.* at 53. The trial court denied Washington's motion; however, before the videotape was played in open court, the trial court admonished the jury as follows:

> I also have a brief admonishment that I want to read to you concerning the contents of the videotape. On the videotape you will see ... are some statements made by Detective Marvin Heilman and Detective Gary Gilbert. You are instructed that what the police officers say

in the course of the interview is not evidence and is not to be considered by you as evidence. Certain things that the police officer say [sic] and representations that they make during the interview may or may not be true. These statements should be considered only as part of the questioning of the Defendant for the purpose of eliciting or drawing out information from the Defendant.

*Id.* at 522.

In *Strong v. State*, 538 N.E.2d 924 (Ind. 1989), this Court held that an audiotape of the defendant's confession to police was admissible, including the interrogating officer's statement, "I want to caution you on one thing. Physical evidence proof, stuff that Lt. Loy saw and found in your house on that night [d]oesn't match stuff that you tell us...." *Id.* at 928. Responding to the defendant's claim of hearsay, we found the statement to be admissible for two reasons. First, the statement was not hearsay because it was not offered to prove the truth of the matters asserted. *Id.* Second, the trial court thoroughly explained in an admonishment to the jury that they were to consider the statement to be a method of questioning intended to elicit information from the defendant and not as evidence of guilt.[3] *Id.*

In *Smith v. State*, 721 N.E.2d 213 (Ind. 1999), this Court found various statements of the interrogating officer to be inadmissible. *Id.* at 216. We reversed the judgment and remanded the cause for further proceedings. Unlike *Strong*, the trial court in *Smith* gave no limiting instruction or admonishment. We held that although a trial court has no affirmative duty to consider giving an admonishment in the absence of a party's request, it is error to

---

**3.** We observe that the admonishment the trial court gave here was nearly identical to the

admonishment the trial court gave in *Strong*.

admit statements by an interrogating officer without any limiting instruction or admonishment. *Id.*

■ Apparently recognizing that in light of *Strong* and *Smith* his hearsay claim cannot prevail, Washington abandons this argument on appeal. Instead, citing Indiana Evidence Rule 704(b), he now claims error because the interrogating officer made several references to Washington's alleged lack of truthfulness during the course of the interrogation.[4] The Rule provides: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." *Id.; see also Shepherd v. State,* 538 N.E.2d 242, 243 (Ind.1989) ("Neither lay witnesses nor expert witnesses are competent to testify that another witness is or is not telling the truth.").

■ We first observe that each reference about which Washington complains is buried within and scattered throughout the twenty pages that he sought to have stricken. Indeed only a careful examination of the transcript even reveals their existence. We fail to see how a jury could have been persuaded by these comments. More importantly, a trial court cannot be found to have erred as to an issue or argument that it never had an opportunity to consider. Accordingly, as a general rule, a party may not present an argument or issue on appeal unless the party raised that argument or issue before the trial court. *Marshall v. State,* 621 N.E.2d 308,

314 (Ind.1993). In such circumstances the argument is waived. *Id.* Because Washington did not direct the trial court's attention to a possible Rule 704 violation, he has waived consideration of this argument on appeal.

## III.

### *Refusal of Tendered Instruction*

■ Washington tendered an instruction on the lesser offense of voluntary manslaughter, which the trial court denied. Washington contends the trial court erred in refusing the tendered instruction because there was a serious evidentiary dispute that distinguished murder from voluntary manslaughter.

■ In deciding whether to give a tendered instruction on a lesser included offense, the trial court is required to determine whether the offense is either inherently or factually included in the charged offense and whether there is a serious evidentiary dispute regarding any element that distinguishes the greater offense from the lesser offense. *Evans v. State,* 727 N.E.2d 1072, 1080–81 (Ind.2000) (citing *Wright v. State,* 658 N.E.2d 563, 566–67 (Ind.1995)). Voluntary manslaughter is an inherently included lesser offense of murder. *Wilson v. State,* 697 N.E.2d 466, 474 (Ind.1998). The only element distinguishing murder from voluntary manslaughter is "sudden heat," which is an evidentiary predicate that allows mitigation of a murder charge to voluntary manslaughter. *Dearman v. State,* 743 N.E.2d 757, 760 (Ind.2001). "Sudden heat" is

---

4. Specifically, Officer Heilman remarked, "[W]e know what you're lying about and I understand you know why you wouldn't just come up and want to tell the truth from the start.... [W]e know you're lying," Joint Ex. 1 at 109; "You lied of course," *id.* at 113; "But that's not true and you know it's not," *id.;* "[Y]ou haven't told us the truth you just keep going the other direction," *id.* at 117; "You can't tell the truth cause you're trying to be untruthful you're trying to lie around the issue," *id.;* "[We] know what you're telling us in [sic] not the truth man," *id.* at 118–19; "Lying about everything, where you been," *id.* at 119; "You lied," *id.* at 136.

characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. *Id.* An instruction on voluntary manslaughter is supported if there exists evidence of sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection. *Id.* Any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter. *Id.*

▪ In this case the trial court made an explicit finding that there was an absence of sudden heat. Thus, we review the trial court's refusal to give Washington's tendered instruction on voluntary manslaughter for an abuse of discretion. *Culver v. State,* 727 N.E.2d 1062, 1070 (Ind.2000). Washington insists there was "appreciable evidence of sudden heat." *See Dearman,* 743 N.E.2d at 760. In support, Washington points to his statements to the police that because he saw Bass with another man he "just lost it" and that he "just couldn't deal with it no [sic] more." R. at 546. In essence Washington seems to contend that he assaulted Bass in a fit of jealous rage. First, anger alone is not sufficient to support an instruction on sudden heat. *Wilson,* 697 N.E.2d at 474. Second, the record does not support Washington's claim that he acted out of a burst of anger. Washington first saw Bass and another man earlier in the evening. However, he did not attack her until several hours later after he had obtained a knife, covered his hands with socks, and waited for the victim to return. This evidence shows a degree of deliberation and cool reflection inconsistent with sudden heat. Accordingly we conclude the trial court did not abuse its discretion in refusing to give Washington's tendered instruction on voluntary manslaughter.

## IV.

### *Lying in Wait*

▪ In a murder case, the State may seek either a death sentence or a sentence of life imprisonment without parole by alleging the existence of at least one of the aggravating circumstances listed in Indiana Code section 35–50–2–9(b). Here, the State sought a sentence of life imprisonment without parole by charging two aggravating circumstances: murder while lying in wait and murder while on probation. *See* I.C. § 35–50–2–9(b)(3), (b)(9)(C). Washington contends that the State failed to prove beyond a reasonable doubt the aggravating circumstance of lying in wait. He does not challenge the sufficiency of the evidence with respect to the (b)(9)(C) aggravator.

▪ Our standard of review for examining the sufficiency of the evidence to support a statutory aggravator is the same standard for determining the sufficiency of the evidence to convict. We examine the evidence tending to support the verdict and all reasonable inferences therefrom without weighing the evidence or assessing witness credibility. *Matheney v. State,* 583 N.E.2d 1202, 1208 (Ind.1992). From this viewpoint, we determine whether the evidence constitutes substantial evidence of probative value from which a reasonable trier of fact could find the existence of the aggravator beyond a reasonable doubt. *Fleenor v. State,* 622 N.E.2d 140, 151 (Ind. 1993).

▪ "Lying in wait involves the elements of 'watching, waiting, and concealment from the person killed with the intent to kill or inflict bodily injury upon that person.'" *Ingle v. State,* 746 N.E.2d 927, 940 (Ind.2001) (quoting *Davis v. State,* 477 N.E.2d 889, 896 (Ind.1985) and *Matheney,* 583 N.E.2d at 1208). Contending

that the only evidence of how the murder was committed comes from his confession, Washington summarizes the evidence and concludes, "a reviewing court cannot conclude that a reasonable jury could infer 'waiting' beyond a reasonable doubt." Br. of Appellant at 23. We believe Washington's summary is incomplete.

In his confession Washington told the officers that he observed Bass and another man earlier in the evening and became upset. Joint Ex. 1 at 138. A video surveillance camera located in the parking lot of Bass' apartment complex showed that later that night, at around 10:40 p.m., Washington was present at the complex. R. at 399–406. Washington knew that Bass and the other man were inside Bass' apartment. Joint Ex. 1 at 147. Washington then left the parking lot and retrieved a butcher knife from his home and tube socks to wear over his hands so that he would leave no fingerprints. *Id.* at 144, 151. An eyewitness saw Washington about a block from Bass' apartment complex walking toward the complex shortly after 11:00 p.m., and the surveillance video captures Washington in the parking lot at around 11:24 p.m. R. at 382–84, 404–07; State's Ex. 33. Washington then saw Bass and the other man leave in Bass' car. Joint Ex. 1 at 148. When Bass returned to the parking lot a short time later Washington "came from behind one of the cars, behind her car" and attacked Bass by stabbing her. *Id.* at 507. A neighbor of Bass discovered her body around 11:35 p.m. R. at 410–11.

The evidence makes clear that Washington did watch and wait for Bass in the parking lot of her apartment complex. The closer question is whether he concealed himself from her. We have held, "The concealment must be used 'as a direct means to attack or gain control of the victim,' creating a nexus between the

watching, waiting, and concealment and the ultimate attack." *Ingle,* 746 N.E.2d at 940 (quoting *Davis,* 477 N.E.2d at 897).

In *Ingle* the defendant was charged with murder and the State sought the death penalty based on two statutory aggravators, one of which was lying in wait. The evidence in that case showed that in the early morning hours of the killing, the defendant threw a brick through the windshield of his ex-wife's car. He then hid in a nearby tree and watched as his ex-wife arrived and talked to the police about the incident. After the police left and his ex-wife went into a nearby pub, the defendant hid a handgun in a nearby tree and left. The defendant then rode to a Goodwill store where he purchased clothing to be used as a disguise. Thereafter the defendant returned to the tree, retrieved the handgun, walked into the pub, and shot his ex-wife. We determined that while the defendant watched, waited and concealed himself in a tree, his concealment did not constitute any part of the murder by lying in wait. Rather, because the defendant left his place of concealment, walked to a nearby campsite, rode to the Goodwill store, and walked into the pub where the fatal shooting occurred, we reasoned that the concealment was not used as a "direct means to attack or gain control of the victim." *Id.* We also observed that a substantial amount of time had elapsed between the defendant's concealment and the killing. *Id.*

The facts in *Ingle* are also similar to those in *Davis,* 477 N.E.2d at 895–97. In that case we also determined that the defendant did not commit a murder by lying in wait. There, the defendant watched and waited from a concealed position, but "did not use the concealment as a direct means to attack or gain control of the victim." *Id.* at 897. Rather, the defendant went openly into the victim's tent and

forced the victim to go with him by use of a deadly weapon. We found that "[t]here was not a sufficient connection between the concealment and the murder ... to support a finding that this murder was committed 'by lying in wait.'" *Id.*

The facts in this case are distinguishable from both *Davis* and *Ingle.* The record shows that on the night of the killing, although slightly illuminated, the parking lot was dark. Joint Ex. 1 at 10, 11. When Bass pulled into the parking space, her car was positioned between cars parked on either side. *Id.* This evidence, coupled with Washington's statement that he "came from behind one of the cars, behind her car" to attack Bass was sufficient for a jury to reasonably infer that Washington was lurking in the dark and hiding behind parked cars waiting for the opportune moment to strike. In sum the evidence demonstrates concealment. As for the nexus between the concealment and the attack, Washington's confession reveals that the attack occurred almost the moment "[Bass] opened the door." *Id.* at 140. According to Washington, "it went fast ... I didn't give her [a chance]." *Id.* at 139–40. The record also shows that only a short amount of time elapsed between Washington's concealment and the killing. We conclude that viewed in the light most favorable to the verdict, there was substantial evidence of probative value from which the jury could find the existence of the lying in wait aggravator beyond a reasonable doubt.

## V.

### *Constitutional Requirements*

Washington next contends that he was sentenced in violation of the United States Supreme Court decisions in *Ring* and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Ring,* the Court overruled *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to the extent that it allowed the judge, and not the jury, to find an aggravating circumstance that supported a death sentence. The Court also determined that *Apprendi* applied to Arizona's death penalty scheme. *Ring,* 536 U.S. at 589, 122 S.Ct. 2428. *Apprendi* had announced the rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348.

In this case, Washington essentially contends that his sentence is invalid because at the time he was sentenced, Indiana's capital sentencing scheme allowed the judge to find the existence of an aggravating circumstance to support a death sentence or sentence of life without parole. We conclude there is no violation of *Ring* or *Apprendi* here.

The record shows the jury was instructed that it may recommend the penalty of life imprisonment without parole only if it finds that the State proved beyond a reasonable doubt the existence of at least one of the alleged aggravating circumstances and that any mitigating circumstances are outweighed by any aggravating circumstance or circumstances. *See* Appellant's App. at 582. The aggravating circumstances that made Washington eligible for a sentence of life without parole were that he had committed the murder while lying in wait, *see* I.C. § 35–50–2–9(b)(3), and that he had committed the murder while on probation. *See* I.C. § 35–50–2–9(b)(9)(C). Importantly, the record also shows the trial court provided the jury with two separate verdict forms explaining:

[I]n the event that you find that the State has failed to prove either of the aggravating circumstances, then you should use this form and find that a sentence of life imprisonment without parole should not be imposed, and that would have to be signed and dated by the foreperson. If on the other hand that you find that the State has proven either or both of the aggravating circumstances beyond a reasonable doubt, you should use this verdict form and on this verdict form you should indicate which one or both of the aggravating circumstances has been proven beyond a reasonable doubt. . . .

R. at 579. Following the trial court's instructions, the jury returned a verdict form specifically finding that the State proved beyond a reasonable doubt that Washington committed murder by lying in wait and while Washington was on probation and that the aggravating circumstances outweighed the mitigating circumstances. Appellant's App. at 597. The jury then recommended that a sentence of life imprisonment without parole be imposed. *Id.* It is clear that the constitutional requirements of *Ring* and *Apprendi* have been satisfied in this case. Washington's claim thus fails.

## VI.

### *Sufficiency of the Sentencing Order*

For his last allegation of error Washington complains that the trial court's sentencing order is not sufficient to support a sentence of life without parole. Specifically Washington contends the sentencing order is deficient in two respects: (i) it fails to set forth specific facts and reasons which lead the court to find the existence of both aggravating circumstances; and (ii)

it fails to set forth the court's personal conclusion that a sentence of life without parole is appropriate for this offender and this crime.

■ A sentence of life without parole is imposed under the same standards and is subject to the same requirements as a death sentence. *Holsinger v. State,* 750 N.E.2d 354, 362 (Ind.2001); *Pope v. State,* 737 N.E.2d 374, 382 (Ind.2000). Because a sentence of life in prison without parole is imposed under the same standards as the death penalty, we require the same specificity from a trial court sentencing a defendant to life in prison without parole as we would a court sentencing a person to death. *Brown v. State,* 783 N.E.2d 1121, 1127 (Ind.2003). The capital sentencing scheme in effect at the time of Washington's trial made clear that the sentencing court had a separate and independent role in assessing and weighing the aggravating and mitigating circumstances and in making the final determination whether to impose a particular sentence. *Id.* at 1128.[5] Accordingly, we have said:

> The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

*Harrison v. State,* 644 N.E.2d 1243, 1262 (Ind.1995) (citations omitted).

---

**5.** Subsequently amended, the statute now provides in pertinent part "For a defendant sentenced after June 30, 2002 ... [i]f the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly." I.C. § 35–50–2–9(e) (West Supp.2003).

■ We disagree with Washington's contention that the sentencing order failed to set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime. Although not using the precise language articulated in *Harrison*, the sentencing order provides: "The Court, giving due consideration to the evidence in this case, the evidence and arguments presented at the sentencing hearing, the Presentence Investigation Report, and the aggravating and mitigating circumstances, finds that a sentence of life imprisonment without parole should be imposed." Appellant's App. at 644. This is sufficient.

■ However, we do agree the sentencing order fails to set forth specific facts and reasons that lead the court to find the existence of the aggravating circumstances. On this point the trial court's sentencing order provides:

Jeffrey Dean Washington did commit the murder of Sandy Bass by lying in wait, and

Jeffrey Dean Washington did commit the murder of Sandy Bass at a time when said Jeffrey Dean Washington was on probation after receiving a sentence for the commission of a felony, to wit: serving probation after a conviction for Stalking, a felony offense, entered in the Posey Circuit Court on January 15, 1997, in Cause Number 65C01–9610–CF–00069.

*Id.* at 641. We observe that the sentencing order merely recites verbatim the language of the jury's verdict form. There is no indication that the trial court engaged in a separate and independent assessment of why it concluded that the State proved the existence of the aggravating circumstances beyond a reasonable doubt. The sentencing order is thus deficient.

■ When faced with an irregularity in a trial court's decision to impose the death sentence or to impose a sentence of life without parole, this Court has various options: (1) remand to the trial court for clarification or a new sentencing determination; (2) affirm the sentence if the error is harmless; or (3) independently reweigh the proper aggravating and mitigating circumstances. *Brown,* 783 N.E.2d at 1129; *Bivins v. State,* 642 N.E.2d 928, 957 (Ind. 1994). In this case, we affirm Washington's life sentence without parole on grounds of harmless error. We do so for the following reasons. The trial court found no mitigating circumstances warranting consideration. *See Bivins,* 642 N.E.2d at 957 (finding harmless error in a death penalty case where trial court's sentencing order was deficient and declaring "significant" that the trial judge found no mitigating factors). Washington does not contend the trial court erred in this regard. And, although not setting forth its specific facts and reasons for so doing, the trial court did expressly find that the charged aggravators were proven beyond a reasonable doubt. Under section IV of this opinion we have already determined there was sufficient evidence of probative value from which a jury could find the existence of the lying in wait statutory aggravator. As for the commission of a murder while on probation, the evidence in the record supports the trial court's conclusion that this aggravator was proved beyond a reasonable doubt, and Washington does not contend otherwise. The trial court also expressly found that the aggravating circumstances outweighed any mitigating circumstances.

Examining the evidence before the trial court, the jury's recommendation in favor of life imprisonment without parole, and the trial court's sentencing order, we are convinced that the trial court would have sentenced Washington to life imprisonment without parole despite the fact that

the trial court failed to set forth specific facts as to why it concluded that the State proved the existence of the aggravating circumstances beyond a reasonable doubt. Thus although the trial court erred in failing to set forth specific facts and reasons to support its conclusion, the error was harmless.

### Conclusion

We affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.

