UNITED STATES of America, Appellee,

v.

Lowell John PAJARI, Appellant.

No. 83–1152.

United States Court of Appeals,
Eighth Circuit.

Submitted June 16, 1983.

Decided Aug. 31, 1983.

James M. Rosenbaum, U.S. Atty., Donald M. Lewis, Asst. U.S. Atty., Dist. of Minn., Minneapolis, Minn., Kevin L. Holden, Legal Intern, for appellee.

Meshbesher, Singer & Spence, Ltd., Kenneth Meshbesher, Carol Grant, Minneapolis, Minn., for appellant.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, and ROSENN,* Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge.

Lowell John Pajari was convicted after a court trial on stipulated facts of one count of possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1976). Pajari also pleaded guilty to making a false income tax return in 1977 in violation of 26 U.S.C. § 7206(1) (1976).[1] Pajari appeals claiming the district court[2] erred in refusing to suppress evidence—an ounce of cocaine—allegedly seized as a result of an illegal arrest. Pajari also contends that his statutory and constitutional

---

* The Honorable Max Rosenn, Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

1. Pajari was fined $1,000 on the income tax count and sentenced to eight years' imprison-

ment on the possession with intent to distribute count.

2. The Honorable Miles Lord, Chief Judge, United States District Court for the District of Minnesota.

speedy trial rights were violated. For the reason set forth herein, we reject these contentions and affirm.

## I.

The evidence presented at the suppression hearing included the search warrant affidavit of D.E.A. Special Agent Lewis, and the testimony of the arresting officers, Hennepin County Detective Fontana and D.E.A. Special Agent Bauer. Pajari did not testify at the suppression hearing. The suppression hearing evidence revealed that D.E.A. agents in Minneapolis had been investigating Pajari's suspected cocaine trafficking since 1974. By March 1980, at least four confidential informants had provided information to D.E.A. agents regarding Pajari's narcotics transactions, indicating that Pajari acquired large quantities of cocaine from California and in turn sold the cocaine to local dealers from his rural residence in Prior Lake, Minnesota.

On March 24 and 25, 1980, one of the confidential informants assisted D.E.A. agents by making two controlled purchases of cocaine from a dealer, John Schepers, who obtained cocaine from Pajari's Prior Lake residence. During both purchases, the informant-purchaser was followed by agents to Schepers' home. After meeting with the informant-purchaser, Schepers would leave his home, drive to Pajari's Prior Lake residence, stay for about ten minutes and then return to his own home where he would deliver an ounce of cocaine to the informant. This information formed the basis for the issuance of a search warrant on March 25, authorizing the search of Pajari's Prior Lake residence.

Also on March 25, following the informant's purchase of cocaine from Schepers, the informant told Detective Fontana that Pajari would be leaving his residence in the late afternoon of that day to pick up a quantity of cocaine. Earlier, Fontana had learned of the informant's purchases of cocaine from Schepers and was aware that a search warrant had been secured authorizing the search of Pajari's residence.

Detective Fontana testified that surveillance officers, who had been staking out Pajari's residence since Schepers' earlier visits, observed Pajari leaving his residence shortly after 5 P.M. The officers followed Pajari to an apartment building in Mounds, Minnesota, and observed Pajari enter the building where he stayed for twenty minutes. As Pajari left the building in his car, one of the surveillance officers reported to Fontana that Pajari appeared nervous and was looking about as if he suspected he was being followed. Shortly thereafter, Fontana and D.E.A. Agent Bauer, who were driving an unmarked car, picked up on Pajari's trail and followed him as he pulled into a parking lot and parked his car. Fontana testified that the officers did not stop Pajari's car but simply parked behind his car.

By the time Officers Fontana and Bauer had parked behind Pajari's car, they knew that a search warrant had been secured authorizing the search of Pajari's residence. The two agents then approached Pajari while he was still in his car. Fontana testified that the purpose in approaching Pajari was to inform him of the search warrant for his residence and to request his presence during its execution. Agent Fontana testified at this point he did not know whether there was probable cause to arrest Pajari.

As they walked toward Pajari's car, both officers observed Pajari place his hands down in front of the seat near the area of his feet. As a result, Detective Fontana, fearing that Pajari was reaching for a weapon, ordered Pajari to put his hands up and exit from the car. After Pajari exited his car, Fontana conducted a protective pat-down search of Pajari. Both officers observed Pajari's pants' cuff up around the top of his right boot and a plastic baggie containing a white powdered substance sticking out of the top of the boot. Detective Fontana removed the baggie during the protective pat-down search. Pajari was then placed under arrest and the seized package was determined to contain an ounce of cocaine. Upon execution of the search warrant at Pajari's later that day, agents discovered numerous items associat-

ed with drug use and trade, including firearms.

On March 26, 1980, Pajari was formally charged by complaint with possession of an ounce of cocaine with the intent to distribute in violation of 18 U.S.C. § 841(a)(1). On April 1, 1980, upon the application of the government, the complaint was dismissed without prejudice to permit further investigation by the D.E.A. In September 1980, the United States Grand Jury, based upon information supplied to the Internal Revenue Service by the D.E.A., began an investigation into possible tax evasion charges against Pajari on income derived from the distribution of drugs. On August 5, 1982, the Grand Jury returned a five-count indictment. Pajari's pretrial suppression motions were heard on August 26 and September 2, 1982, and denied. On October 18, 1982, Pajari pleaded guilty to one count of filing a false income tax return in 1977 (26 U.S.C. § 7206(1)) and was also found guilty, after a court trial on stipulated facts, of one count of possession with the intent to distribute an ounce of cocaine. (21 U.S.C. § 841(a)(1)). At that time, Pajari expressly reserved his right to appeal the district court's dismissal of his motion to suppress evidence seized as a result of his arrest on March 25, 1980, and the dismissal of his speedy trial claim.

## II.

Pajari's principal contention on appeal is that Officers Fontana's and Bauer's initial approach to Pajari's car amounted to an unlawful seizure, supported by neither probable cause nor reasonable articulable suspicion that Pajari had engaged in any criminal wrongdoing. Pajari alternatively suggests that even if the initial approach was not a seizure, the officers had no reason to believe that Pajari was armed and dangerous so as to justify the pat-down search for weapons. Pajari thus concludes that the cocaine seized was the fruit of an illegal arrest and should have been suppressed.

A police encounter constitutes a seizure sufficient to trigger fourth amendment protections only if, in view of all of the circumstances surrounding the incident, a reasonable person, innocent of any crime, would have believed he was not free to leave. *United States v. Wylie,* 569 F.2d 62, 68 (D.C.Cir.1977); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J.), 560 n. 1 (Powell, J. concurring). As the Court in *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968) noted:

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

In *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, Justice Stewart gave the following examples of kinds of circumstances that would indicate a demonstration of force or authority sufficient to constitute a seizure:

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

In this case, we conclude that there was no "seizure" or "stop" until Pajari was ordered to raise his hands and leave his car, which was prompted by Detective Fontana's reasonably based fear that Pajari was reaching for a weapon. Only at the point when Pajari was ordered to raise his hands and exit the car was there any demonstration of force or authority creating a reasonable apprehension on Pajari's part that his freedom of movement was restrained. The uncontradicted testimony of both arresting officers established that Pajari stopped his car voluntarily, without any coercive action being taken by the officers. When the officers approached Pajari's car, they neither summoned Pajari nor had their guns drawn. The main purpose in approaching Pajari was to inform him of the impending

search of his residence and to request his presence during that search.

Pajari, however, points out that the officers could have made this request when he first left his house and they did not have to wait until he had parked his car. He accordingly suggests that this delay indicates the officers really intended to arrest or detain him for his suspected criminal activities rather than to merely request his presence at the search warrant execution. First, we note that the record reveals that any delay between the officers' knowledge of the existence of the search warrant and the initial approach to Pajari was of a very short duration. Moreover, this delay does not necessarily show that the officers' stated reason for approaching Pajari was pretextual. Certainly surveillance officers are not obligated to terminate surveillance and reveal themselves to a criminal suspect the moment they learn that a search warrant has been obtained authorizing the search of the suspect's dwelling. Finally, regardless of any delay, the officers' uncontradicted testimony established that their initial approach could not have amounted to a demonstration of force or authority sufficient to cause a reasonable person in Pajari's position to believe his freedom of movement was being restrained.

■ However, assuming *arguendo* that the initial approach here constituted a forcible stop, we nevertheless view it as a wholly legitimate investigative stop justified by the officers' reasonable, articulable suspicion that Pajari was engaged in criminal activity. As the court recently emphasized in *United States v. Place*, —— U.S. ——, ——, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983), *Terry* and its progeny give police officers the authority "to make a *forcible stop* of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *Id.* (Emphasis in original). *See Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972) (police officer authorized to make forcible stop of suspect to investigate informant's tip that suspect was carry-

ing narcotics and a concealed weapon). In determining whether there is reasonable, articulable suspicion sufficient to justify a particular stop, "the totality of the circumstances—the whole picture must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). As the court in *Terry* expressed, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–1881.

■ When the officers initially approached Pajari, they possessed the following information: at least four reliable, confidential informants had identified Pajari as a major cocaine trafficker; on March 24 and 25, an informant had purchased ounce quantities of cocaine which could be traced to Pajari's Prior Lake residence; the same informant tipped the agents that Pajari would be leaving his Prior Lake residence in the late afternoon to purchase cocaine; Pajari, as predicted, left his residence about 5 P.M. and drove to an apartment building where he stayed for about twenty minutes; a search warrant had been issued to search Pajari's Prior Lake residence, a residence that was surrounded by a very sophisticated security apparatus; Pajari appeared nervous while he was driving and when he parked his car. We conclude that this information gave the officers reasonable, articulable suspicion that Pajari was involved in criminal activity, justifying the investigative stop at issue here. In *United States v. Henderson*, 645 F.2d 627 (8th Cir.1981), *cert. denied*, 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981), the court reviewed and upheld an investigative stop under circumstances very similar to those presented in this case.

■ Pajari, relying on *Augilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), contends that the informant-purchaser's tip

in this case was unreliable and without a sufficient factual basis to establish either probable cause to arrest him or reasonable suspicion to stop him. We believe the reliability of the informant's tip in this case was beyond question. The informant had provided accurate information to drug enforcement authorities in the past and, within 48 hours prior to the stop, had participated in two controlled purchases of cocaine which could be traced to Pajari's residence.[3] Furthermore, the informant's tip was partially corroborated by independent police surveillance. *See Illinois v. Gates,* —— U.S. ——, ———–———, 103 S.Ct. 2317, 2333–34, 76 L.Ed.2d 527, 550–51 (1983); *United States v. Sanders,* 631 F.2d 1309, 1312–13 (8th Cir. 1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). And, even assuming *arguendo* that the tip, considered in the context of all of the other information known by the officers, may have been insufficient to sustain a probable cause arrest under *Augilar-Spinelli,* it certainly carried enough indicia of reliability to justify the investigative stop of Pajari. *See Adams v. Williams,* 407 U.S. 143, 147, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *United States v. Scott,* 545 F.2d 38, 40 (8th Cir.1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977).[4]

■ Having determined that the agents were justified in approaching Pajari's car (because the approach either did not amount to a seizure or if it did it was a legitimate investigative stop), we now consider whether the subsequent detention and protective pat-down search was a reasona-

ble intrusion in light of the circumstances. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1879.

The court in *Terry* stated that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person [suspect] is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24, 88 S.Ct. at 1881. Furthermore, the court has frequently recognized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long,* —— U.S. ——, ——, 103 S.Ct. 3469, 3479, 77 L.Ed.2d 1201 (1983); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977) ("According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.L.C. & P.S. 93 (1963). *Adams v. Williams,* 407 U.S. at 148, n. 3 [92 S.Ct. at 1924, n. 3] (1972).")

Considering all of the circumstances in this case, we conclude that the officers had reason to believe that Pajari posed a danger, justifying a limited pat-down search designed to insure the officers' safety. When the officers approached Pajari's car they had reason to believe they were confronting a major narcotics dealer. A search warrant had already been issued to search

---

**3.** We do not believe that the district court erred in refusing to require the government to disclose, prior to trial, the identity, whereabouts, and possible criminal record of the confidential informant-purchaser. The informant was not a witness to the March 25, 1980, contact between Pajari and the officers and was not a potential witness material to Pajari's defense. *See United States v. Anderson,* 627 F.2d 161, 164 (8th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483 (1980); *Roviaro v. United States,* 353 U.S. 53, 60–63, 77 S.Ct. 623, 627–629, 1 L.Ed.2d 639 (1957).

**4.** We are thus not called upon to determine whether the "totality of circumstances" stan-

dard for determining probable cause enunciated in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) is to be retroactively applied in the place of the two-pronged test ("reliability" and "basis of knowledge") established by *Augilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). We also note that Pajari does not contend that the affidavit in support of the application for the search warrant was insufficient to show probable cause existed for issuance of the search warrant. Pajari's appeal focuses only on whether there was probable cause to arrest him.

Pajari's Prior Lake residence, which was surrounded by a highly sophisticated security apparatus. The officers had observed that Pajari appeared nervous while he was driving and after he parked his car, as if he were aware that he was being followed. When the officers walked toward the car, they saw Pajari reach down with his hands toward his feet. This gave Detective Fontana a reason to believe that Pajari might be reaching for a weapon. Fontana therefore ordered Pajari to raise his hands and exit the car, after which Fontana conducted a limited pat-down search to determine whether Pajari had a weapon and if so to disarm him. We believe this intrusion here was "strictly circumscribed by the exigencies which justifi[ed] its initiation." *Terry*, 392 U.S. at 26, 88 S.Ct. at 1882.

After the officers legitimately ordered Pajari out of his car for a pat-down search, they observed in plain view a plastic baggie that was partially hanging out of the top of Pajari's right boot. It was readily apparent to both officers that the baggie contained a white substance. As a result, the officers, having at this point probable cause to associate the white substance with criminal activity, *i.e.,* the possession of cocaine, legitimately seized the baggie. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465–68, 91 S.Ct. 2022, 2037–39, 29 L.Ed.2d 564 (1971); *Texas v. Brown*, —— U.S. ——, —— —— ——, 103 S.Ct. 1535, 1540–43, 75 L.Ed.2d 502, 511–14 (1983).

Pajari points to a purported ambiguity in the record as to whether the officers first noticed the baggie before or during the pat-down search. The record does reflect that the baggie could have been observed in plain view immediately after Pajari exited the car. In any event, regardless of whether the officers first noticed the baggie either before or during the pat-down search, the search itself was a reasonable intrusion, thus permitting the seizure of any item revealed in plain view during the search which the officers had probable cause to associate with criminal activity. *Coolidge v. New Hampshire*, 403 U.S. at 465–68, 91 S.Ct. at 2037–39; *Texas v. Brown*, —— U.S.

at —— —— ——, 103 S.Ct. at 1540–43, 75 L.Ed.2d at 511–14.

## III.

Pajari also contends that the government's prosecution in August 1981 of a drug charge originally filed in March 1980 violates the Speedy Trial Act, Title 18 U.S.C. § 3161 *et seq.* (1976). We disagree.

The drug charge at issue, filed March 26, 1980, was dismissed on April 1, 1980, at the government's request, without prejudice to permit further investigation. On August 5, 1982, Pajari was charged on a five-count grand jury indictment. The Speedy Trial Act certainly contemplates the dismissal and subsequent reinstatement of criminal charges, and accordingly provides that the interim period is excluded from the computation of the applicable time limitations. 18 U.S.C. § 3161(d) and (h)(6). *United States v. MacDonald*, 456 U.S. 1, 7 n. 7, 102 S.Ct. 1497, 1501 n. 7, 71 L.Ed.2d 696 (1982); *United States v. Boles*, 684 F.2d 534, 535–36 (8th Cir.1982).

Similarly, the sixth amendment speedy trial clause "has no application after the Government, acting in good faith, formally drops charges." *MacDonald*, 456 U.S. at 7, 102 S.Ct. at 1501. Once the drug charge was dismissed in April 1980, Pajari was "in the same position as any other subject of a criminal investigation." *Id.,* at 8–9, 102 S.Ct. at 1502–1503. Thus, any delay between the dismissal of the original charge and the return of the indictment cannot be attacked under the sixth amendment speedy trial guarantee. *Id.; Boles,* 684 F.2d at 535. We also note that the preindictment delay here did not violate the due process clause because Pajari failed to demonstrate that the government intentionally delayed seeking an indictment in order to gain a tactical advantage or that his defense was substantially prejudiced by the delay. *Boles,* 684 F.2d at 536.

Affirmed.