# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JESSIE A. COOK**
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana



FILED
Jul 22 2014, 8:56 am
CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

ROBERT L. DIXON,                               )
                                               )
    Appellant-Defendant,                       )
                                               )
            vs.                        )    No. 84A01-1307-CR-339
                                               )
STATE OF INDIANA,                              )
                                               )
    Appellee-Plaintiff.                        )

APPEAL FROM THE VIGO SUPERIOR COURT
The Honorable Michael J. Lewis, Judge
Cause No. 84D06-1106-FA-2054

**July 22, 2014**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-defendant, Robert L. Dixon (Dixon), appeals the trial court's denial of his motion to suppress certain evidence which was discovered in violation of his Fourth Amendment Rights.

We reverse and remand.

## ISSUE

Dixon raises one issue on appeal, which we restate as: Whether Dixon's patdown search following a traffic infraction violated his rights under the Fourth Amendment of the United States Constitution.

## FACTS AND PROCEDURAL HISTORY

At approximately 1:00 a.m. on June 16, 2011, Officer Adam Loudermilk of the Terre Haute Police Department (Officer Loudermilk) was on patrol in his marked vehicle when he observed a blue 1998 Chevrolet Cavalier operated by Dixon in the vicinity of First Avenue and 16th Street in Terre Haute, Indiana. Officer Loudermilk had been following the vehicle for three or four blocks when Dixon made a turn without signaling. The Officer decided to stop Dixon and activated his lights. Dixon pulled his vehicle into a parking spot in a residential neighborhood, stopped, and turned off his car. When Officer Loudermilk exited his vehicle, he noticed that Dixon had gotten out of his car and had started walking towards a residence. Officer Loudermilk approached Dixon and told him, "Hey, you need to get back in your car[,]" but Dixon continued to walk away. (Transcript p. 10). After Officer Loudermilk took out his taser and instructed Dixon for a third time to get back into his car, Dixon stopped and asked, "What did I do? What did I

2

do?" (Tr. p. 10). Officer Loudermilk responded, "You just needed to use your turn signal. It's not that big of a deal. Just have a seat in your car and we'll go from there." (Tr. p. 10). Officer Loudermilk walked Dixon back to Dixon's vehicle.

Officer Loudermilk instructed Dixon to sit in the driver's seat with the door open, while the Officer remained standing next to the open door. When Dixon handed the Officer his license and identification, Officer Loudermilk recognized Dixon's name. A week or two previously, Officer Loudermilk was approached by an individual, whom he knew from when this person was an inmate at the county jail, who told him that Dixon was selling narcotics in Terre Haute. Although Officer Loudermilk did not find any irregularities in Dixon's identification or license, he requested the presence of another officer.

After Officer Birchfield arrived, Officer Loudermilk decided to take Dixon out of Dixon's car to pat him down. Officer Loudermilk asked Dixon to place his hands on top of the vehicle and began the patdown search. Officer Loudermilk felt a baggie "with a rock in there" in Dixon's right front pants' pocket. (Tr. p. 21). When Officer Loudermilk grabbed the baggie, Dixon took his hands off the car and Officer Loudermilk decided to handcuff him as he had not yet checked Dixon's waistband or other pockets. Officer Loudermilk took Dixon's left hand and brought it behind Dixon's back; however, when the Officer took hold of Dixon's left hand, Dixon elbowed him in the nose. Because Dixon attempted to flee, the officers took him to the ground and tased him twice. Officer Loudermilk eventually handcuffed Dixon and found three baggies on his person.

3

On June 30, 2011, the State filed an Information, charging Dixon with Count I, dealing in cocaine, a Class A felony, Ind. Code § 35-48-4-1; Count II, possession of cocaine, a Class B felony, I.C. § 35-48-4-6; Count III, battery resulting in bodily injury, a Class D felony, I.C. § 35-42-2-1; and Count IV, resisting law enforcement, a Class A misdemeanor, I.C. § 35-44-3-3. On June 4, 2012, Dixon filed a motion to suppress the cocaine found on his person following the patdown search, which was heard by the trial court on December 13, 2012. On May 28, 2013, the trial court, adopting the State's proposed findings of fact and conclusions of law *verbatim*, denied Dixon's motion to suppress. On July 1, 2013, the trial court certified its Order for interlocutory appeal, which we accepted on August 23, 2013.

Additional facts will be provided as necessary.

DISCUSSION AND DECISION

On interlocutory appeal, claiming a violation of the Fourth Amendment of the United States Constitution, Dixon contends that Officer Loudermilk's patdown search was not based on a reasonable suspicion that criminal activity may be afoot or on a reasonable concern for the Officer's safety.

We review a trial court's denial of a motion to suppress in a manner similar to review of other sufficiency issues. *Sanders v. State*, 989 N.E.2d 332, 334 (Ind. 2013), *reh'g denied*. There must be substantial evidence of probative value in the record to support the ruling of the trial court. *Id*. We do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court's ruling. *Id*.

4

The Fourth Amendment to the United States Constitution protects persons from unreasonable search and seizure, and this protection has been extended to the states through the Fourteenth Amendment. *N.W. v. State*, 834 N.E.2d 159, 161 (Ind. Ct. App. 2005), *trans. denied*. As a general rule, the Fourth Amendment prohibits a warrantless search because "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *N.W.*, 834 N.E.2d at 162. "[I]t is well-settled Fourth Amendment jurisprudence that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has reasonable suspicion that criminal activity 'may be afoot.'" *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind. Ct. App. 2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)), *trans. denied*.

Moreover, after making a *Terry* stop, if an officer has a reasonable fear of danger, he may perform a carefully limited patdown of the outer clothing of the individual in an attempt to discover weapons which might be used to assault the officer. *Parker v. State*, 697 N.E.2d 1265, 1267 (Ind. Ct. App. 1998), *trans. denied*. The *Terry* patdown should be confined to its protective purpose. If the facts known by the officer at the time of the stop are such that a man of reasonable caution would believe that the action taken was appropriate, the Fourth Amendment is satisfied. *Id*. Thus, an officer's authority to conduct a patdown search is dependent upon the nature and extent of the particularized

5

concern for his safety. *N.W.*, 834 N.E.2d at 162. "[A]n individual stopped may not be frisked or patted down for weapons, unless the officer holds a reasonable belief that the particular individual is armed and dangerous." *Id.* (quoting *Swanson v. State*, 730 N.E.2d 205, 210 (Ind. Ct. App. 2000)). These specific inferences must amount to something more than an officer's "inchoate and unparticularized suspicion or hunch." *Terry,* 392 U.S. at 27. The "demand for specificity in the information upon which police action is predicated is the central teaching of [our Supreme Court's] Fourth Amendment jurisprudence." *Id.* at 21 n.18.

Because the standard under *Terry* is one of objective reasonableness, we are not limited to what the stopping officer testifies to or to evidence of his subjective rationale; rather, we look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been in fear of his safety. *See Parker*, 697 N.E.2d at 1267. The Court recognized in *Terry* that encounters between the police and citizens "are incredibly rich in diversity," that "[n]o judicial opinion can comprehend the protean variety of the street encounter," and that "we can only judge the facts of the case before us." *Terry*, 392 U.S. at 12, 15.

Because the validity of an investigatory stop and protective *Terry* patdown depends on the facts and circumstances of each particular case, it is important that the parties build the record to the fullest degree possible through extensive and detailed examination of the witnesses. Here, the trial court focused on Officer Loudermilk's testimony as developed by the State through its direct examination and reiterated in its

6

proposed findings of fact and conclusions of law. However, the analysis of the transcript reveals a more diverse set of circumstances.

Officer Loudermilk had received information from an informant that Dixon might be a drug dealer. The Officer testified that after he received this communication, he investigated where Dixon lived and drove by his residence "a couple times" but "[n]ever saw any activity." (Tr. p. 33). On June 26, 2011, Officer Loudermilk started following Dixon's vehicle. After trailing Dixon for three to four blocks, Dixon made a turn without signaling and Officer Loudermilk commenced a traffic stop. Absent failing to signal the turn, the Officer had not observed any erratic driving, furtive movements, or irregularities with Dixon's vehicle. Dixon pulled his vehicle into a parking spot in a residential neighborhood, stopped, and turned off his car. Officer Loudermilk testified that "Dixon was getting out of his car when [the Officer] activated [his] lights" and started walking towards a house. (Tr. p. 40).

When Officer Loudermilk observed Dixon walking towards the house, he did not see a weapon in either hand and "nothing about [Dixon's] appearance led him to believe he was engaged in criminal activity." (Tr. p. 43). After ordering Dixon to return, Officer Loudermilk walked Dixon back to his vehicle. Besides Dixon's question about what he did wrong, Dixon did not argue with the Officer. The Officer conceded that "he did not observe anything threatening about [Dixon]." (Tr. p. 47). Without patting him down first, Officer Loudermilk told Dixon to get back into the driver's seat of his car. The Officer stood next to the open driver's door and requested Dixon's identification. While checking for possible open warrants on Dixon, the Officer remained by the open door.

7

No irregularities in Dixon's identification or open warrants were found. However, after noticing Dixon's name on his identification, the Officer "had this feeling that something was wrong." (Tr. p. 53). The Officer decided to request the presence of another officer to conduct a patdown because he "believed that there was possibly something in that car. Whether it be gun, whether it be drugs, something." (Tr. p. 65).

To support its denial of Dixon's motion to suppress, the trial court emphasized the "extreme" nervousness displayed by Dixon while seated in the car. (*See* Appellant's Br. p. 29). Specifically, the trial court points to Dixon's failure to make eye contact with the Officer, his rocking back and forth in the seat, and digging in his pockets. However, this can reasonably be explained by the fact that Officer Loudermilk, although conceding that Dixon did not exhibit any threatening conduct, displayed his taser during the entire duration of the traffic stop, including when the Officer was standing next to the open driver's door.

Viewed sequentially, the picture emerges that Dixon had already pulled into a parking spot prior to the Officer activating his lights and signaling the commencement of the traffic stop. Dixon did not exhibit any threatening conduct or belligerent tone of voice. Cooperating with the Officer, who walked Dixon back to his car and stood next to the open driver's door, Dixon handed him his identification. Only after the Officer recognized Dixon's name as a possible drug dealer, the Officer started voicing a belief that he needed "to put this guy in handcuffs until [he] find[s] out what's going on." (Tr. p. 22).

Under the *Terry* doctrine, a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has stopped. Nothing in *Terry* can be understood to allow a generalized cursory search for weapons or indeed, any search for anything but weapons. *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979). "The narrow scope of the *Terry* exception does not permit a frisk for weapons on less than a reasonable belief or suspicion directed at the person to be frisked." *Id.* Here, Officer Loudermilk's actions ostensibly belie the fact that he was concerned for his safety. We reverse the trial court's decision and remand to the trial court for further proceedings in accordance with this opinion.[1]

## CONCLUSION

Based on the foregoing, we conclude that the trial court abused its discretion when it denied Dixon's motion to suppress evidence located in violation of Dixon's Fourth Amendment rights.

Reversed and remanded.

ROBB, J. concurs

BRADFORD, J. dissents with separate opinion

---

[1] Because we reverse the trial court's decision based on a Fourth Amendment violation, we do not need to address Dixon's alternate argument pursuant to Article I, Section 11 of the Indiana Constitution.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT L. DIXON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 84A01-1307-CR-339 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**BRADFORD, Judge, dissenting**

Because I conclude that Officer Loudermilk had sufficient reason to believe that Dixon might have been armed and dangerous during their encounter, I believe that the officer's pat-down of Dixon was justified by concerns for officer safety. Consequently, I would not suppress the drugs that were subsequently found on Dixon's person, and I respectfully dissent.

At approximately 1:00 a.m., Officer Loudermilk was on patrol in his marked police vehicle when he observed a Chevrolet Cavalier make a turn without signaling.

10

Officer Loudermilk activated his lights and siren, and the Cavalier pulled over with Officer Loudermilk behind. When Officer Loudermilk exited his vehicle, he noticed that the driver of the Cavalier, who was Dixon, was also exiting his vehicle. Officer Loudermilk approached Dixon and said, "Hey, you need to get back in your car[,]" but Dixon continued walking away. Tr. p. 10. Officer Loudermilk said again, "Hey, you need to get back in your car[,]" but Dixon again continued to walk away. Tr. p. 10. When Officer Loudermilk took his Taser out and, without pointing it at Dixon, said, "You need to get back in your car" a third time, Dixon finally stopped. Tr. p. 10. When Dixon asked, "What did I do? What did I do?", Officer Loudermilk responded, "You just needed to use your turn signal. Just have a seat in your car and we'll go from there." Tr. p. 10. In Officer Loudermilk's experience, when a person exits a vehicle during a traffic stop, it means that the person does not want to be associated with the car or is trying to avoid the encounter with police altogether.

Officer Loudermilk had Dixon sit in Dixon's vehicle with the door open so that he could observe him. In Officer Loudermilk's words, "I wanted to keep an eye on him in case there was weapons or drugs." Tr. p. 15. When Dixon gave Officer Loudermilk his identification, Officer Loudermilk realized that he recognized Dixon's name. A week or two previously, a girl who Officer Dixon knew from when she was an inmate at the county jail approached him and told him that she had information that he might want. The informant told Officer Loudermilk that "there was a guy that lived in the area by the name of Robert Dixon and he was a black male and she was at his house earlier in the week and he had a large amount of cocaine at his house and he was dealing." Tr. p. 17.

11

The informant offered this information to Officer Loudermilk freely and in return for nothing.

While Dixon was in the vehicle, his demeanor was extremely nervous: He was rocking in his seat, would not look at Officer Loudermilk and was digging in his pockets. Officer Loudermilk told Dixon at least twice to leave his hands on the steering wheel where he could see them, but Dixon would quickly remove them again. Dixon had not dealt with a person more nervous in almost nine years as a police officer. Officer Loudermilk testified that he did not know whether Dixon "was waiting for [me] to turn [my] back so [Dixon] can pull out a gun and shoot [me]" Tr. p. 19. Officer Loudermilk called for backup, and Officer Birchfield soon arrived.

After Officer Birchfield arrived, Officer Loudermilk decided to pat down Dixon for weapons. Officer Loudermilk asked Dixon to exit his vehicle and said, "I'm going to make sure there's not no weapons on ya." Tr. p. 21. Officer Loudermilk had Dixon place his hands on top of the vehicle and began his pat-down. Officer Loudermilk felt a baggie "with a rock in there" in Dixon's right front pants pocket. Tr. p. 21. When Officer Loudermilk grabbed the baggie, Dixon's hands came off of the car, and Officer Loudermilk decided to handcuff him, as he had not yet checked Dixon's waistband or other pockets.

Officer Loudermilk took hold of Dixon's left hand and brought it behind Dixon but, when he moved to take hold of Dixon's right hand, Dixon elbowed him in the nose. Dixon attempted to run away but the officers successfully took him to the ground. Dixon continued to struggle, attempting to roll over onto his back and digging in his pockets.

12

Eventually, Officer Loudermilk tased Dixon, who initially began resisting again but stopped once Officer Loudermilk tased him a second time. Officer Loudermilk handcuffed Dixon, searched him, and found three baggies containing suspected cocaine on his person, which evidence Dixon filed a motion to suppress.

> We review a trial court's denial of a motion to suppress in a manner similar to review of other sufficiency issues. *Taylor v. State*, 689 N.E.2d 699, 702 (Ind. 1997). There must be substantial evidence of probative value in the record to support the ruling of the trial court. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court's ruling. *Id.* We review *de novo* the determination of reasonable suspicion for a warrantless search. *Myers v. State*, 839 N.E.2d 1154, 1160 (Ind. 2005) (citing *Ornelas v. United States*, 517 U.S. 690, 694-700, 116 S. Ct. 1657, 1660-64, 134 L. Ed. 2d 911, 917-21 (1996)).

*Sanders v. State*, 989 N.E.2d 332, 334 (Ind. 2013).

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966). "In *Wolf* [*v. People of State of Colorado*, 338 U.S. 25, 27 (1949), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961)] we recognized '(t)he security of one's privacy against arbitrary intrusion by the police' as being 'at the core of the Fourth Amendment' and 'basic to a free society.'" *Id.*

13

"[I]t is well-settled Fourth Amendment jurisprudence that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion that criminal activity 'may be afoot.'" *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind. Ct. App. 2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)), *trans. denied.* Moreover,

> [a]fter making a *Terry* stop, if an officer has a reasonable fear of danger, he may perform a carefully limited patdown of the outer clothing of the suspect in an attempt to discover weapons which might be used to assault the officer. The *Terry* patdown should be confined to its protective purpose. If the facts known by the officer at the time of the stop are such that a man of reasonable caution would believe that the action taken was appropriate, the Fourth Amendment is satisfied.

*Parker v. State*, 697 N.E.2d 1265, 1267 (Ind. Ct. App. 1998) (citations omitted), *trans. denied.*

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Cf. Beck v. State of Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 226, 13 L. Ed. 2d 142 (1964); Brinegar v. United States, 338 U.S. 160, 174-176, 69 S. Ct. 1302, 1311, 93 L. Ed. 1879 (1949); Stacey v. Emery, 97 U.S. 642, 645, 24 L. Ed. 1035 (1878). And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. Cf. Brinegar v. United States, supra.

*Terry*, 392 U.S. at 27 (footnote omitted).

Considering only the evidence favorable to the trial court's judgment, a man of

reasonable caution would believe that Officer Loudermilk's actions were appropriate, given the information at his disposal at the time of the pat-down. Although Dixon argues that Officer Loudermilk patted him down on nothing more than a "hunch" that he might be armed and dangerous, Dixon's argument disregards the fact that he walked away from his vehicle after being stopped, repeatedly ignoring Officer Loudermilk's commands that he return. In Officer Loudermilk's experience, such behavior indicates a desire to distance oneself from something in the vehicle or to escape the encounter altogether. As the Indiana Supreme Court has put it, flight "is 'the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such' and warrants further investigation by police." *Hardister v. State*, 849 N.E.2d 563, 570 (Ind. 2006) (quoting *Illinois V. Wardlow*, 528 U.S. 119, 124 (2000)). Once back in his vehicle, Dixon's demeanor was extremely nervous—indeed, Dixon was the most nervous person Officer Loudermilk had ever encountered on the job. Dixon repeatedly failed to comply with Officer Loudermilk's requests that he keep his hands on the steering wheel, refused to look at Officer Loudermilk, was rocking in his seat, and was digging in his pockets. Dixon's behavior was unsettling enough that Officer Loudermilk did not run his plates for fear of turning his back on Dixon.

Moreover, during the course of the stop, Officer Loudermilk became aware that Dixon was likely the person he had recently been told was a drug dealer who had large amounts of cocaine in his residence. Because this information was delivered face-to-face by a person known to Officer Loudermilk, it bears indicia of reliability. When an informant relates information to the police face-to-face, the officer has an opportunity to

15

assess the informant's credibility and demeanor. *U.S. v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). Additionally, a face-to-face tipster has surrendered her anonymity. "[C]itizens who personally report crimes to the police thereby make themselves accountable for lodging false complaints." *Id*. (citing *Illinois v. Gates*, 462 U.S. 213, 233-34 (1983)). Finally, the tip was freely given, and the informant was neither offered nor given anything in return.

Having information that he might be dealing with a drug dealer in Dixon, Officer Loudermilk was reasonably concerned about the possibility that Dixon might be armed. Several courts have recognized that "drug dealers and weapons go hand in hand[.]" *State v. Richardson*, 456 N.W.2d 830, 836 (Wis. 1990) (citing *U.S. v. Pajari*, 715 F.2d 1378 (8th Cir. 1983); *U.S. v. Post*, 607 F.2d 847 (9th Cir. 1979); and *U.S. v. Oates*, 560 F.2d 45 (2d Cir. 1977)); *see also, e.g.*, *U.S. v. Salazar*, 945 F.2d 47, 51 (2d Cir. 1991) (noting that the officers in question were "sufficiently experienced to know that narcotics dealers frequently carry weapons"); *U.S. v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (concluding that frisk was justified where "officers … suspected Gilliard of having participated in a narcotics sale and knew that firearms are 'tools of the trade[]'").

While any one factor standing alone might not support a pat-down for officer safety, the overall circumstances do. In short, the information known to Officer Loudermilk at the time of the pat-down would cause a man of reasonable caution to believe his actions were appropriate. Dixon's attempt to distance himself from Officer Loudermilk and/or his vehicle; his repeated refusal to follow Officer Loudermilk's instructions; his repeated attempts to seemingly access something in his pockets (which

16

might have been a weapon); his extreme nervousness; and Officer Loudermilk's information, bearing indicia of reliability, that Dixon might be a drug dealer, all combine to provide sufficient justification for a pat-down for weapons.

Dixon relies on our opinion in *Jett v. State*, 716 N.E.2d 69 (Ind. Ct. App. 1999), in which we found a pat-down to be unconstitutional. *Jett*, however, is readily distinguished. In *Jett*, the defendant's vehicle was stopped, and Jett exited his vehicle. *Id*. at 70. When the officer asked Jett to return, Jett immediately complied. *Id*. The officer then asked Jett to submit to a pat-down, which uncovered incriminating evidence, and which we found to be unconstitutional, resulting in the reversal of Jett's conviction. *Id*. at 71. In this case, however, Officer Loudermilk had much more. As previously mentioned, Dixon repeatedly refused to comply with Officer Loudermilk's requests to return to his vehicle and keep his hands on the wheel and behaved in a suspicious and nervous manner. In addition, Officer Loudermilk had credible information that Dixon might be a drug dealer. Because the two cases are factually distinguishable, Dixon's reliance on *Jett* is unavailing. The trial court did not abuse its discretion in denying Dixon's motion to suppress on the basis that Officer Loudermilk's search violated the Fourth Amendment.[2]

---

[2] Although Dixon makes a separate argument pursuant to Article I, Section 11 of the Indiana Constitution, "Indiana has adopted the *Terry* rationale in determining the legality of an investigatory stop under Article I, Section 11." *Holbert v. State*, 996 N.E.2d 396, 400 (Ind. Ct. App. 2013) (citing *Wilson v. State*, 670 N.E.2d 27, 29 (Ind. Ct. App. 1996)), *trans. denied*. Consequently, we need not address this argument separately.